No. 81-523

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

IN THE MATTER OF M.G.M.,
YOUTH IN NEED OF CARE.

---

Appeal from:   District Court of the Thirteenth Judicial District,
               In and for the County of Yellowstone
               Honorable Charles Luedke, Judge presiding.

Counsel of Record:

    For Appellant:

        Patten and Renz, Billings, Montana
        Jeffrey Renz argued, Billings, Montana

    For Respondent:

        Olsen, Christensen and Gannett, Billings, Montana
        Damon Gannett argued, Billings, Montana
        Harold F. Hanser, County Attorney, Billings, Montana
        Stephen Rowinski argued, Deputy County Attorney,
         Billings, Montana

---

Submitted:   September 17, 1982

Decided:   December 9, 1982

Filed: DEC 9 - 1982

_Thomas J. Kearney_
                         Clerk

Mr. Justice Frank B. Morrison, Jr., delivered the Opinion of the Court.

Frank Fitzgerald, the natural father of the child, M.G.M., appeals from a judgment issued by the District Court of the Thirteenth Judicial District, Yellowstone County, terminating his parental rights.

The child, M.G.M., was born out of wedlock on June 10, 1972. She lived solely with her mother until 1979, when the Department of Social and Rehabilitation Services (SRS) placed her in a foster home. In April 1980, the mother's parental rights were terminated.

When appellant discovered the proceedings to terminate the mother's parental rights, he filed an acknowledgement of paternity of the child and sought unsuccessfully to intervene in the proceedings.

On May 28, 1980, SRS filed a petition for temporary investigative authority and protective services, claiming that M.G.M. was in danger of being abused and neglected by the appellant. The District Court granted the petition. Appellant was not allowed contact with the child except by recommendation of mental health worker and psychiatric nurse, Mary Honaker. The District Court also ordered appellant to undergo a psychological evaluation.

In July 1980, appellant was allowed to meet with his child for the first time. Two one-hour sessions were held under the supervision of Mary Honaker. The meetings were then discontinued because the child appeared upset and frightened by her father.

On September 11, 1980, the guardian ad litem for the child filed a petition to determine paternity and to determine whether appellant's parental rights should be terminated under the provisions of the Uniform Parentage Act specifically section 40-6-130, MCA. On September 23, 1980, SRS filed a petition under section 41-3-401, MCA, asking that M.G.M. be declared dependent and neglected, and requesting permanent custody and authority to

assent to adoption. Over objections by appellant, the District Court consolidated the proceedings brought by the guardian and the SRS.

On November 14, 1980, pursuant to section 40-6-111, MCA, the District Court declared that appellant was the natural father of M.G.M.

A series of hearings were then held. Nearly all of the evidence at these hearings pertained to the mental health of the child and her father.

Based on the testimony at the hearings, the District Court made the following significant findings of fact:

"5. That the natural mother of M.G.M. was diagnosed as an undifferentiated schizophrenic, and that M.G.M. spent the first five years of her life living in her custody. During that time, M.G.M. failed to develop normally as a child, and exhibited some of the characteristics found in schizophrenia. She also suffered from a failure to develop self-identity, having adapted to a role-reversal with her mother. During such five years, Frank [appellant] was rejected by the mother in all contacts; and M.G.M. knew him only through the mother's revulsion to him and her identification of him as the 'kook.'

"6. That there is a statistically-established relationship between schizophrenia in parents and consequent development of schizophrenia in children, based upon genetic and environmental factors.

"7. That because of M.G.M.'s genetic background, as well as the environment in which she lived for the first five years of her life, she is 'at risk' to develop the mental illness of schizophrenia.

"8. M.G.M., in addition, is a very intelligent and particularly sensitive, fragile and chameleon-like young lady, for whom it is extremely important to provide a strong, stable adult female role model in order that she may develop normally from a girl into a young woman.

"9. Frank is skilled in the field of electronics and is regularly employed with a good work record. He gets along with his fellow employees and is financially sound. He is a law-abiding citizen. He has never been married, and the longest period of close association with a woman has been seven months.

"10. That Frank has a medical history which includes a diagnosis by the Veterans Administration in 1963, as:

"'. . . schizophrenic reaction, undifferentiated type, in a good partial remission, manifested by some blunting of emotions, restricted interests, mentally competent . . .'

"for which he receives a 70% disability pension.

"11. That Frank has also been diagnosed as a schizophrenic by Dr. Ned Tranel, a clinical psychologist, as of July 30th, 1980. That conclusion is echoed by the psychiatric nurse, Mary Honaker, who has had past contact with Frank in the course of working with M.G.M. and M.G.M.'s mother over the years since prior to M.G.M.'s birth.

"12. Frank has also been diagnosed as having a schizotypal personality disorder by Dr. Stephen Wagner, another clinical psychologist. This is a condition which is said to make him less than ideal as a parent, but not to render him completely inadequate, making possible a trial period of closely monitored visitation between Frank and M.G.M. as an evidence-gathering device for a later determination as to custody.

". . .

"15. Efforts at accomplishing visitation between Frank and M.G.M. were recently made, and two meetings did occur. The results were described as a 'smothering' by Frank of M.G.M., with an adverse effect upon M.G.M. in the form of extreme fright, a five-pound weight loss, stress, and a regression in reality testing. As a consequence, visitation efforts were terminated.

"16. That on the basis of the totality of the psychiatric and psychological examinations conducted of Frank, together with the other evidence adduced, it is clear that placing custody of M.G.M. with Frank would increase the risk of her becoming mentally ill by a probability greater than 50% at a minimum, in the view of one witness, and to an almost certainty in the view of others. Because of the demonstrated adaptive characteristics of M.G.M., it is clear that a placement of her with Frank will clearly result in a loss of her own identity and development, and tip the already heavily-weighted scale of M.G.M.'s future against her normal development.

"17. Under the circumstances existing, it would be detrimental to the best interests of M.G.M. to defer a final decision with respect to her custody pending the implementation of further visits with Frank as an evidence-gathering measure, since the adaptive characteristics of M.G.M. would render the results untrustworthy and, also because of Frank's determination to reject any results not favorable to his dispositions in any and all events. The status of the evidence clearly

- 4 -

advises that the process of attempting further trial visitation would in itself be a destructive one from M.G.M.'s standpoint.

"18. Under the circumstances existing, it would also be detrimental to the best interest of M.G.M. to be placed in the permanent custody of Frank."

The District Court then concluded as a matter of law that it would be in M.G.M.'s best interest to place her in the custody of SRS, and that appellant's parental rights be terminated.

Appellant has raised the following issues for review:

(1) Whether the District Court erred by applying the "best interests of the child" test in section 40-6-130(1), MCA, instead of the "abuse and neglect" standards in sections 41-3-401, MCA, et seq.?

(2) Whether there is clear and convincing evidence to support either the "best interests of the child" test or the "abuse and neglect" test?

(3) Whether psychiatric nurse, Mary Honaker, was qualified to give an expert opinion and diagnosis of appellant's mental health?

Appellant claims that sections 40-6-128 and 40-6-130, MCA, should not have been applied to him, and that the District Court therefore erred by terminating his parental rights absent any findings of abuse or neglect. We agree and remand for further findings.

Here, the District Court apparently applied the "best interests of the child" standard from section 40-6-130(1), MCA. Section 40-6-130(1), MCA, provides in part:

"If the court finds it would not be in the best interests of the child to grant custody to the putative father, the court shall terminate his rights to the child."

Section 40-6-128(1), MCA, describes when the "best interests of the child" test should be applied to a putative father:

"If a child is born out of wedlock and the mother executes or proposes to execute a release terminating her rights to the child or if the child otherwise becomes the subject of an adoption proceeding, the agency person to whom the child has been or is to be

- 5 -

relinquished or the mother or person having custody of the child shall file a petition in the district court to terminate the parental rights of the father, unless the father's relationship to the child has been previously terminated or determined not to exist by the court. The court shall hold a hearing as soon as practical to determine the identity of the father and to determine or terminate the rights of the father as provided in this section and 40-6-129 and 40-6-130 . . ." (Emphasis added.)

The key language here is "or if the child otherwise becomes the subject of an adoption proceeding." Respondents claim that when the mother's rights were terminated, the child became subject to a "potential adoptive proceeding." Admittedly, however, SRS is seeking temporary custody on the grounds that M.G.M. is a youth in need of care and neglected or abused within the meaning of section 41-3-401, et seq., MCA. As such, the provisions governing a "youth in need of care" proceeding must be controlling.

Moreover, section 40-6-128, MCA, did not give the guardian of the child the right to petition for termination of the appellant's parental rights. Only "the agency, person to whom the child has been or is relinquished or the mother or the person having custody" may file a petition for determination of a putative father's rights. The District Court erred by consolidating the guardian's petition with that of SRS.

It is well-established that absent findings of abuse or neglect based upon clear and convincing evidence, parental rights may not be terminated. Matter of Guardianship of Doney (1977), 174 Mont. 282, 570 P.2d 575; In re the Matter of J.L.B. (1979), 182 Mont. 100, 594 P.2d 1127; and Stanley v. Illinois (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. These constitutionally protected parental interests in the child are not weakened by the fact that a child is born out of wedlock. Matter of J.L.B., 594 P.2d at 1136, referring to Stanley v. Illinois, 405 U.S. 651-652, 92 S.Ct. at 1213, 31 L.Ed.2d at 559.

Further, this Court has held that a finding of abuse, neglect, or dependency "is the jurisdictional prerequisite for

any court ordered transfer of custody." In re Gore (1977), 174 Mont. 321, 570 P.2d 1110, 1113.

Only *after* a showing of dependency, abuse, or neglect, is the "best interests of the child" test the appropriate basis for determining custody. See Doney, supra; Gore, supra; Henderson v. Henderson (1977), 173 Mont. 429, 568 P.2d 177; and In the Matter of the Guardianship of Aschenbrenner (1979), 182 Mont. 540, 597 P.2d 1156, 1162.

Therefore, the District Court here was obligated to find that the child was a "youth in need of care" and abused or neglected in order to deprive appellant of custody and terminate his rights. Section 41-3-102, MCA, provides the applicable definitions:

> "(2) An 'abused or neglected child' means a child whose normal physical or mental health or welfare is harmed or threatened with harm by the acts or omissions of his parent or other person responsible for his welfare.
>
> "(3) 'Harm to a child's health or welfare' means the harm that occurs whenever the parent or other person responsible for the child's welfare:
>
> "(a) inflicts or allows to be inflicted upon the child physical or mental injury, including injuries sustained as a result of excessive corporal punishment;
>
> ". . .
>
> "(5) 'Threatened harm' means imminent risk of harm.
>
> ". . .
>
> "(8) 'Mental injury' means an identifiable and substantial impairment of the child's intellectual or psychological functioning."

During appellate argument, the guardian for the child admitted that the District Court had not made any findings that the child was abused or neglected by appellant. The findings only determined the child's best interests. More importantly, these findings do not provide a sufficient basis on which to conclude that the child would be in danger of "imminent risk of harm" if she lived with or visited with appellant. We therefore remand this case for further findings.

On remand, the opinion of the psychiatric nurse that appellant is suffering from schizophrenia should not be admitted without further foundation. We agree that the determination of a person as an expert is within the discretion of the trial court, and can be set aside only upon abuse of discretion. Goodnough v. State (1982), _____ Mont. _____, 647 P.2d 364, 39 St.Rep. 1170. Rule 702, M.R.Evid. Nevertheless, nothing in this record suggests that the nurse has had the training, experience, or education to diagnose schizophrenia. See Jenkins v. U.S. (1962), 307 F.2d 637.

The District Court judgment is reversed and remanded for further findings.

_____
Justice

We concur:

_____
_____
_____
_____
Justices

- 8 -