Justice Ingrid Gustafson delivered the Opinion of the Court.
***519 ¶1 M.R. (Father) appeals from the termination of his parental rights issued December 7, 2018, by the Eleventh Judicial District Court, Flathead County. We reverse and remand for the Department to conduct initial preliminary assessment of Father as the first placement option for E.Y.R. (Child) consistent with its policies and this opinion.
¶2 We restate the issue on appeal as follows:
Whether Father's due process rights were infringed by ineffective assistance of counsel resulting in his parental rights being inappropriately terminated.
FACTUAL AND PROCEDURAL BACKGROUND
¶3 The Montana Department of Public Health and Human Services, Child and Family Services Division (Department), removed Child, along with Child's two half-siblings, in November 2016. They were removed from Mother's care for exposure to domestic violence between Mother and her boyfriend, unstable living conditions, and concerns of substance abuse by Mother. There were no allegations of abuse or neglect by Father. Father was living in California and uninvolved with Mother. Father learned of the Montana proceeding and Child's placement in foster care on December 23, 2016. Father was contacted and told Child was in foster care, but was not advised as to how to get her in his care. Father immediately went to the family court in California to obtain an order to return Child to his care.
¶4 The District Court in Montana held a show cause hearing on January 23, 2017, at which Father appeared telephonically and was represented by Ms. Travis, who sat in for Father's court-appointed counsel, Ms. Marvin. During this hearing, attorney Travis reported Father stipulated to temporary legal custody (TLC) and advised there was a *1119 pending family court action in the Superior Court of California, San Diego County, Case No. D531866, in which a January 18, 2017 court order recognized Mother was in violation of the court's prior parenting plan order and set hearing thereon in May 2017. Ms. Travis further represented "discussions with the Department, and I understand that an ICPC is beginning to be conducted to look at him as a placement for [Child] in California." Ms. Travis further indicated Father did not stipulate to any placement recommendation of the Department and that he was requesting to be the placement for Child. ***520 The Department advised all of the children were placed with maternal grandmother and step-grandfather and that it would continue that placement. The District Court then responded, "Very well. There appearing no objection it's so ordered as well. All right. Last call. Anything further from anyone." Ms. Travis, despite previously indicating Father sought to be the placement for Child, did not object to the placement with the maternal grandmother and step-grandfather, did not object or otherwise indicate there was no need for an ICPC to place Child with Father, and did not request the District Court set a placement hearing. Further, she did not advise the court of the provisions of § 40-6-221, MCA, which provide that father and mother are equally entitled to parent and if either is unable to exercise parenting, the other is entitled to parent the child. Counsel also did not advise the court of the Department's policy 304-1 which provides "the non-custodial parent is the first placement option for the child" when the child is removed from the home of the custodial parent. Child and Family Services Policy Manual, § 304-1 (DPHHS 2014), https://perma.cc/95CE-7DBY.
¶5 On February 24, 2017, the District Court held a hearing to approve a treatment plan for Mother. During this hearing, no mention was made as to Father. In May, Father appeared in family court in California to modify the parenting plan between Mother and him. At that time, the California court inquired as to the status of this matter in Montana. Father related that he was previously advised an ICPC was requested but had not occurred and he had not been contacted by anyone in California with regard to this.
¶6 Presumably in response to this proceeding, the judge in California contacted the department in California and learned no ICPC had been requested and that the Department in Montana had not yet contacted the department in California. In July 2017, Judge Braner, a Superior Court Judge in San Diego County working in the Family Law Department sent the District Court a letter. At the outset, Judge Braner asserted, "I believe that the Uniform Child Custody [Jurisdiction] Enforcement Act (UCCJEA), California, and more particularly this Court, has custody jurisdiction over [Child]."[1] The ***521 California court expressed concern that Father had been attempting to enforce the California parenting order in California. The California court also related Father's frustration with the Montana dependency action in that Father "maintains he has not seen his daughter in more than six months" and "he has essentially been kept in the dark regarding the Montana proceedings and that while he has been appointed a State Public Defender, that person has failed to apprise Father of anything in connection with the Montana proceedings."
¶7 In response to the communication from the California court, the District Court issued an Order to Show Cause and Notice of Hearing, setting hearing on August 9, 2017, and advising the parties to appear at that time to show cause as to whether Montana should seek continuing jurisdiction or whether the case should be dismissed and returned to California. Despite the District Court's show cause order advising as to the nature of the hearing, neither the Department's counsel, counsel for Mother, nor Ms. Marvin were prepared for meaningful discussion or legal *1120 analysis of the UCCJEA and they provided little, if any, accurate information regarding such. The Department asserted that UCCJEA consideration was not needed, arguing a Title 41 action trumps a parenting plan. The District Court correctly rejected this argument because a Title 41 action must still comply with the UCCJEA. Section 40-7-103, MCA. Father's counsel indicated she had no legal authority to cite but that Father felt the case should be in California. Commendably, the District Court attempted to work through the UCCJEA statutory scheme. It correctly noted Montana had temporary emergency jurisdiction and California was the home state pursuant to § 40-7-204, MCA, such that jurisdiction would need to continue in California unless counsel could point to an exception in the UCCJEA that permitted Montana to continue to exercise jurisdiction. The District Court then concluded Montana could maintain jurisdiction "if this Court were to determine that Montana should be deemed the more convenient forum for determining the custody of [Child]." Although the District Court asked counsel if she had any authority to suggest the court's reading of the statutory scheme was wrong, Father's counsel did not respond and failed to point out to the court that §§ 40-7-201(1)(b) and -203(1), MCA, require the home state of the child-here, California-to make the determination that the court of another state would be a more convenient forum.[2]
¶8 The District Court then requested the parties argue why Montana ***522 was the more convenient forum. For the first time in this case, Mother's attorney asserted Mother came to Montana due to a fear of Father. Father then interjected that he had been attempting to find and serve Mother with a parenting action ever since she left California. He reported Mother was absconding and not permitting him the parenting ordered by the California court. Father also volunteered he had discovered the Department's representation to the court eight months prior that it had made a request for an ICPC was inaccurate. Father explained he had been trying in California to obtain an order to return Child to California and through that process the California court contacted the California department to inquire about the status of the ICPC and learned no such request had been made. Other than expressing Father felt if the case was not retained in California he would lose all of his rights, counsel made no argument advocating Father's position.
¶9 The District Court then reviewed the statutory factors set forth in § 40-7-108, MCA, to determine which jurisdiction-Montana or California-was the most convenient forum. Ultimately, the District Court found Montana to be the more convenient forum as witnesses and Mother, who was working a treatment plan, resided in Montana. In its consideration of the statutory factors set forth in § 40-7-108, MCA, the District Court specifically considered whether placing Child under Montana's jurisdiction versus California's would place Child at risk for experiencing domestic violence and concluded, "I haven't heard any representation, offer of proof, or evidence today that would suggest that California is a place where there would likely be domestic violence." Further, in its response letter to Judge Braner, the District Court related, "I found no convincing evidence or record-based representation which suggests that [Child] would be subjected to a home life marked by domestic violence were she to reside in California." At this time, eight months into the cause and following the Department's Petition for First Extension of Temporary Legal Custody, the Department had made no allegations regarding Father and the District Court had specifically found no safety issues regarding the Child were she to reside in California. Despite this, and Father's repeated protestations that there were no allegations against him, Father's counsel did not further request hearing or any other action to accomplish placement of Child with Father.
¶10 Father appeared telephonically at the extension of TLC hearing on August 25, 2017. At that hearing, the Department advised California had rejected doing an ICPC regarding Father as Father was the non-custodial parent. The Department stated California would not ***523 do an ICPC unless Father *1121 had a treatment plan and then asserted the only available option was to give Father a treatment plan. Father related he did not believe he needed to complete a treatment plan as he had previously completed a 52-week domestic violence prevention program in conjunction with prior court proceedings between Mother and him in California and done everything else the court there had required of him. Father's counsel appeared to acquiesce in the imposition of a treatment plan for Father and did not dispute the Department's claim that there was no other option than to impose a treatment plan on Father. In light of this discussion, Father indicated he would be willing to consider a treatment plan. The Department reported it had not yet developed a treatment plan for Father.[3] Based on the hearing discussion, the District Court indicated it was inclined to grant extension of TLC and set a treatment plan hearing.
¶11 The treatment plan hearing was held November 3, 2017. Father and his counsel voiced objection to the allegation contained in the treatment plan-concern for Father's present ability to safely parent Child based on past drug use, criminal records, and domestic violence-to which the District Court responded its understanding of the allegation was "that Father's ability to provide an appropriate parenting situation and shelter for [Child] is in question." Father again disputed this. The Department then explained, "It's always difficult in these cases when a non-offending parent is living out of state" and iterated a treatment plan to be the only means of getting information regarding Father's housing, income, history, and criminal and child protective services backgrounds. After Father again indicated he did not understand why he was now being required to complete a treatment plan, as well as his concerns he had not been provided resources similar to Mother throughout the case and had not been provided visitation over the past eleven months, the District Court requested his counsel summarize her client's legal position. Father's counsel responded, "It's hard for me to tell, Your Honor, because I don't quite understand it."
¶12 The District Court then explained to Father he had heard his objection, "it's a matter of record, I've not been asked to make a ruling based on your objection," explained it was necessary to have a treatment plan to obtain an ICPC, and then asked Father if he would sign the treatment plan. Thereafter, Father relented and agreed to the proposed treatment plan. Throughout this proceeding, Father's counsel ***524 did not object to imposition of a treatment plan; did not advocate any other options or means by which the Department could obtain information about Father's history, income, or living environment; and did not object to any of the proposed tasks of the treatment plan or question their appropriateness.
¶13 On February 16, 2018, Father appeared telephonically at a status hearing. At that hearing, the District Court explained to Father that the Department had the impression he was not cooperating with it. Again, Father explained he did not understand the Department's case-Child was removed from Mother's care and the allegations of concern for Father's present ability to safely parent Child underlying the treatment plan were not correct and were never proven. Father further asserted he had previously completed a 52-week domestic violence prevention program which the Department then seemingly accepted as completion of the domestic violence counseling, but indicated Father still needed to complete a mental health evaluation. Father responded that Child Protection Specialist (CPS) Lindal had sent him an email stating he did not have to complete the mental health evaluation. Via telephone, CPS Lindal confirmed she had told Father he did not need to complete a mental health evaluation, but he should do domestic violence counseling. The Department's attorney then indicated the Department now also wanted Father to complete a mental health evaluation. Throughout the discussion at this hearing, Father's counsel did not object to re-imposition of tasks the Department conceded *1122 were completed or unnecessary and did not advocate on Father's behalf to specify any remaining treatment plan tasks.
¶14 Father again appeared telephonically at the hearing on the Department's petition for a second extension of TLC on March 9, 2018. At the outset of the hearing, in response to the District Court's inquiry as to Father's position, Father's counsel admitted she did not know his position. Thereafter, CPS Lindal testified Father had been employed since November 2016 and that he had safe and stable housing. She testified the Department had concerns of domestic violence and chemical dependency, but did not testify as to any recent or current behaviors evidencing these concerns, mentioning only that Father had a remote drug conviction and Mother had obtained a restraining order in 2011.[4] CPS Lindal also explained that California had not started an ***525 ICPC as Father had not yet finished his treatment plan. CPS Lindal admitted Father provided her documentation of completing the 52-week domestic violence prevention program with "as expected" mastery of the materials, but she indicated it was from 2012 or 2013 and there was a notation therein that he did not take responsibility for his actions.[5] CPS Lindal admitted, however, that the Department's concerns regarding domestic violence stemmed only from Mother's report as to when she lived with Father approximately six years previously.[6] Father's counsel did not follow up on California's reported demand that Father complete his treatment plan prior to initiating an ICPC, did not request the court issue an order for immediate completion of an ICPC before Father completed all treatment plan tasks, did not advocate any other options for obtaining the information which would be gathered through an ICPC,[7] and did not follow up with CPS Lindal to ascertain what efforts she made to determine what the domestic violence program provider meant when it indicated successful completion of the program despite the notation Father did not admit ***526 any "abusive/ aggressive" behaviors in the past. At the end of the hearing, the District Court granted the extension of TLC.
¶15 On April 23, 2018, the District Court heard the Department's petition to terminate Mother's parental rights. Although Father did not appear, he was represented by newly-appointed counsel, Mr. Hinchy. At the conclusion of the hearing, the District Court terminated Mother's parental rights and the Department stated its intention for Child to remain with the grandparents on a long-term basis.
¶16 In June 2018, the Department requested the District Court adopt a permanency *1123 plan which provided for Child to be adopted by her maternal grandparents. Hearing on the permanency plan request was held July 13, 2018. Attorney Larson, filling in for Mr. Hinchy, represented Father. Prior to connecting with Father telephonically, it was disclosed that while Child was residing with her maternal grandmother, Child had been sexually assaulted by her half-brother who had now been removed from the residence.[8] Upon being connected telephonically to the hearing, Father again reiterated his belief that the Department had failed to substantiate any allegations of abuse or neglect against him. Father also outlined his considerable frustration in trying to work with the Department to complete treatment plan tasks. He asserted the Department failed to provide funding for services and sent him for services but when he arrived there was no referral for him to receive the services. He had also been sent to providers who were no longer at the location where he was directed to go. Father also asserted he had recently become aware of some type of incident detrimental to Child occurring while in the maternal grandmother's care but had been unable to get more information as to exactly what occurred. Father became so frustrated during this hearing that the District Court had to terminate his participation in the hearing.
¶17 Hearing on the Department's petition to terminate Father's parental rights was held November 7, 2018, where Father appeared telephonically and was represented by Hinchy. CPS Lindal testified the Department had concerns Father used methamphetamine and engaged in domestic violence. She claimed to have "numerous papers" indicating restraining orders and violations of such by Father. Contrarily, CPS Lindal was then forced to admit the only information she had about Father's purported domestic violence was what Mother had asserted in her restraining order request in 2011 and that she had ***527 made no independent investigation with regard to the veracity of Mother's assertions. Further, she admitted she did not undertake any follow-up with Father's prior domestic violence prevention counselor who certified Father's prior successful completion of a 52-week program with above expectation in taking "initiative, consistent presentation/progress in attitude, thought[,] feeling, [and] behavior," but instead concluded from one sentence in his report that Father did not take responsibility, Father's completion was specious and he needed to re-do domestic violence prevention counseling. Father testified again that the restraining order event with Mother in 2011 did not involve violence, but rather he determined it best not to contest her request for a restraining order. He testified he violated the restraining order when he called Mother to check on her and Child when he believed Mother was using drugs and not providing stability for Child. He testified he then successfully completed the 52-week domestic violence counseling program, but did not admit to committing violence as he had not engaged in any violence against Mother. Throughout this case, the Department has not entered evidence of any domestic violence incident or specific concern arising regarding Father occurring after Father completed the 52-week domestic violence prevention program in May 2013.
¶18 With regard to Father's criminal history, CPS Lindal admitted a background check was not even requested until June 2018, and not received by the Department until July 2018. By the time the background check was requested, the Department had already indicated its permanency plan to be termination of Father's parental rights followed by adoption with the maternal grandparents. Father's background check and CPS history did not demonstrate recent or current dangerous criminal, domestic violence, or child protective history for Father. Rather, Father's criminal background check showed the remote felony drug conviction from 2000, a single restraining order violation in 2012, and a misdemeanor drug possession charge in 2016. Father again testified to the remote nature of the felony drug offense, and that he had completed a prison sentence and discharged probation prior to Child's birth. He further testified he received a misdemeanor drug charge in early 2016 which he did not *1124 contest because a passenger in his car had a small amount of an unknown drug in his car. He testified this was resolved by his attendance at some NA classes.
¶19 CPS Lindal also asserted Father did not show a desire to care for Child as he had not seen Child for some months before her removal from Mother, but did not elaborate as to any investigation she did to determine why this may have occurred. Father testified he had been ***528 repeatedly attempting to obtain his parenting time with Child through the California court system, but Mother had failed to comply with the California parenting orders, refusing to bring Child to California and keeping her whereabouts in Montana unknown to him.[9]
¶20 At the conclusion of the termination hearing, the District Court terminated Father's parental rights, finding Father had stipulated to a treatment plan and therefore accepted the allegations contained therein and waived any further right to contest them. The District Court then found Father failed to complete the treatment plan and his excuses for not completing the treatment plan tasks were not credible and further concluded that because of Father's continued insistence that the court lacked jurisdiction, his non-compliance was more willful than circumstantial. Based primarily on the misdemeanor offense from 2016, the District Court concluded Father's behaviors were unlikely to change within a reasonable time. Father appeals.
STANDARD OF REVIEW
¶21 This Court reviews a district court's decision to terminate parental rights for an abuse of discretion. In re K.A. , 2016 MT 27, ¶ 19, 382 Mont. 165, 365 P.3d 478. The Department has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been satisfied. In the context of parental rights cases, clear and convincing evidence is the requirement that a preponderance of the evidence be definite, clear, and convincing. In re K.L. , 2014 MT 28, ¶ 14, 373 Mont. 421, 318 P.3d 691. This Court reviews a district court's findings of fact for clear error and conclusions of law for correctness. In re M.V.R. , 2016 MT 309, ¶ 23, 385 Mont. 448, 384 P.3d 1058. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces this Court a mistake was made. In re E.Z.C. , 2013 MT 123, ¶ 19, 370 Mont. 116, 300 P.3d 1174. "To reverse a district court's evidentiary ruling for an abuse of discretion, this Court must determine the district court either acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." In re I.M. , 2018 MT 61, ¶ 13, 391 Mont. 42, 414 P.3d 797 (citation omitted).
¶22 "[P]arents have a due process right to effective assistance of counsel in termination proceedings." In re A.S. , 2004 MT 62, ¶ 20, 320 Mont. 268, 87 P.3d 408. Whether assistance was effective requires ***529 review of counsel's training, experience, and advocacy. IAC requires reversal only if the parent suffered prejudice. In re B.M. , 2010 MT 114, ¶ 22, 356 Mont. 327, 233 P.3d 338 (citation omitted). Effectiveness is evaluated by the non-exclusive factors of training and experience and advocacy. In re A.S. , ¶ 26. Effective advocacy requires investigating the case, researching and understanding the law, meeting with the client, and assiduously advocating for the client. In re A.S. , ¶ 28.
DISCUSSION
¶23 Whether Father's due process rights were infringed by ineffective assistance of counsel resulting in his parental rights being inappropriately terminated.
¶24 Father asserts he received ineffective assistance of counsel when his court-appointed counsel, Ms. Marvin, failed to assiduously advocate for him throughout the entirety of her representation.[10] Father asserts he "was *1125 a non-offending parent with no credible or recent allegations that he was unable to parent [Child]," that California was the proper place for jurisdiction as the family court in California had already entered a parenting plan, and that he was "qualified to have this matter dismissed in favor of custody to him under Title 41, the ICPC, and the UCCJEA." Father asserts his counsel failed to recognize or advocate for placement with him and dismissal and instead "acquiesced in the Department's incorrect assertion that Father was required to have a treatment plan."
¶25 The Department contends Father cannot establish how his counsel failed to advocate for him by not advocating for placement of Child with Father outside the demands of an ICPC as the District Court was presented with sufficient reasons to agree with the Department that Father's capacity to safely parent should be evaluated. Further, the Department asserts that even if Father can establish ineffective assistance of counsel for counsel's failure to pursue placement with Father and dismissal of the case, he cannot establish how the outcome would have been different as the District Court was advised of Father's wishes to have Child placed with him at the show cause hearing.
Legal Framework
¶26 In termination proceedings, § 41-3-609(1)(f), MCA, protects a parent's fundamental right to the care and custody of a child.
***530 In re D.B. , 2007 MT 246, ¶ 17, 339 Mont. 240, 168 P.3d 691. A district court may only terminate the parent-child relationship of an adjudicated YINC if it finds "by clear and convincing evidence that: (1) an appropriate court-approved treatment plan was not complied with by the parents or was not successful; and that (2) the conduct or condition of the parents rendering them unfit was unlikely to change within a reasonable time." In re X.M. , 2018 MT 264, ¶ 18, 393 Mont. 210, 429 P.3d 920 (citing § 41-3-609(1)(f)(i), (ii), MCA ).
¶27 Since "a natural parent's right to care and custody of a child is a fundamental liberty interest," a district court "must adequately address each applicable statutory requirement" before terminating an individual's parental rights. In re Matter of A.T ., 2003 MT 154, ¶ 10, 316 Mont. 255, 70 P.3d 1247 (citation omitted).
¶28 Section 40-6-221, MCA, provides:
The father and mother of an unmarried minor child are equally entitled to the parenting, services, and earnings of the child. If either parent is dead or unable or refuses to exercise parenting or has abandoned the family, the other parent is entitled to the parenting, services, and earnings of the child, unless care of the child is determined otherwise pursuant to 40-4-221.[11 ]
Consistent with a parent's fundamental right to parent and § 40-6-221, MCA, the Department has adopted a policy regarding non-custodial parents:
When a child must be removed from the home of the custodial parent because of child abuse or neglect, the non-custodial parent is the first placement option for the child considered by the Child Protection Specialist. In general, placement of the child with the noncustodial parent is more favored than placement with a member of the child's extended family. Placement with a non-custodial parent is presumed to be in the best interests of the child.
Unless the Department has documented evidence to indicate that the child should not be placed with the non-custodial parent because of safety concerns, the non-custodial parent should be the first placement option considered .
Legal/birth parents have the right to parent their children unless a court finding or circumstances negate that right. As a ***531 corollary, children have the right to be placed with their legal/birth parents unless that parental authority has been abused. *1126 When the parental rights of one parent are terminated, the parent whose rights have not been terminated has legal custody of the child absent an adjudication of youth in need of care based upon the parenting behavior of the parent whose rights have not been terminated .
...
The non-custodial parent is the first placement option for the child unless the Child Protection Specialist has documented good cause to the contrary exists indicating placement with the non-custodial parent could not assure the child's safety. The Child Protection Specialist must document and provide a written copy to the non-custodial parent as to why such placement is not in the child's best interests.
Child and Family Services Policy Manual, § 304-1 (DPHHS 2014), https://perma.cc/95CE-7DBY (emphasis added).
¶29 Upon removal of a child from a custodial parent, the Department must first consider placement of the child with the non-custodial parent. Of course, prior to doing so, the Department should determine if there are any observable or substantiable imminent safety risks to the child if the child is placed in the care of the non-custodial parent. This determination does not at the outset require full investigation of or implementation of an ICPC or a treatment plan for the non-custodial parent, but rather occurs along a continuum. Typically, this would involve conducting a CPS history and potentially a criminal background check as well as gathering information from the non-custodial parent as to his/her work and earnings, his/her residence and who, if anyone s/he resides with, who is part of his/her support system, and potential collateral contacts who can verify the information provided. If any of the information from the CPS history, the criminal background check, or other information provided by the non-custodial parent raises objective, demonstrable circumstances indicative of an imminent safety threat to the child, the CPS case worker should follow up with further investigation to confirm the information provided by the non-custodial parent.[12] If objective, demonstrable circumstances indicate a potential imminent safety risk to the child after completing this preliminary investigation, the CPS
***532 worker may expand the investigation.[13] If objective, demonstrable circumstances indicate a potential imminent safety risk to the child after completing this more in-depth investigation, the CPS worker may request a court order permitting the Department to further evaluate the noncustodial parent consistent with § 41-3-438(3)(b) and (c), MCA.[14]
¶30 While an ICPC may be indicated if objective, demonstrable circumstances warrant the Department seeking a court order to evaluate the non-custodial parent, an ICPC is not required merely because a non-custodial parent resides in another state. Pursuant to ICPC Regulation No. 3, adopted by Admin. R. M. 37.50.901 (2016), placement may be made without completing an ICPC:
3. Placements made without ICPC protection:
(a) A placement with a parent from whom the child was not removed: When the court places the child with a parent from whom the child was not removed, and the court has no evidence that the parent is unfit, does not seek any evidence from the receiving state that the parent is either fit or unfit, and the court relinquishes jurisdiction over the child immediately upon placement with the parent. Receiving state shall have no responsibility for supervision or monitoring for the court having made the placement.
(b) Sending court makes parent placement with courtesy check: When a sending court/agency seeks an independent *1127 (not ICPC related) courtesy check for placement with a parent from whom the child was not removed, the responsibility for credentials and quality of the "courtesy check" rests directly with the sending court/agency and the person or party in the receiving state who agree to conduct the "courtesy" check without invoking the protection of the ICPC home study process. This would not prohibit a sending state from requesting an ICPC.
ICPC Regulations, Regulation No. 3 (Association of Administrators of the Interstate Compact on the Placement of Children 2011), ***533 https://perma.cc/YC6U-5RTX.
¶31 Although the Department is obligated to initially provide the custodial parent a treatment plan and services designed to ameliorate his/her parenting deficiencies when a child has been adjudicated a youth in need of care, such does not suspend or reduce the non-custodial parent's fundamental right to parent. If there are no objective, demonstrable circumstances of imminent safety risk to the child upon the Department's preliminary investigation, the Department must first look to place the child with the non-custodial parent and document good cause to the contrary indicating how the non-custodial parent could not assure the safety of the child.[15] If the child has been adjudicated a youth in need of care, and no objective, demonstrable circumstances of imminent safety risk to the child have been identified, upon disposition the court may either "order the temporary placement of the child with the noncustodial parent, superseding any existing custodial order, and keep the proceeding open pending completion by the custodial parent of any treatment plan" or "order the placement of the child with the noncustodial parent, superseding any existing custodial order, and dismiss the proceeding with no further obligation on the part of the department to provide services to the parent with whom the child is placed or to work toward reunification of the child with the parent or guardian from whom the child was removed in the initial proceeding." Section 41-3-438(3)(c) and (d), MCA.
¶32 This legal framework is consistent with In re J.B. , 278 Mont. 160, 923 P.2d 1096 (1996) and In re S.S. , 2012 MT 78, 364 Mont. 437, 276 P.3d 883. In In re J.B. , J.B. was removed from his mother's care and adjudicated a youth in need of care. His father, who resided out of state, stipulated to the Department's request for TLC, and indicated a desire to obtain custody of J.B. The Department ultimately sought and obtained termination of mother's parental rights. The Department also sought extension of TLC to which father consented. After the extension of TLC was granted and approval of a second treatment plan for father issued, father again sought permanent custody of J.B. Following hearing, the court determined the Department should retain TLC for ***534 another year as requested by the Department. Upon father's appeal we reversed as the determination of J.B. as a youth in need of care was not based on evidence of father's abuse or neglect:
In the present action, there are two parties petitioning for custody of the child: J.B.'s natural father and the State of Montana (through DFS). For a court to have jurisdictional authority to grant custody to a non-parent, certain steps must be followed. When the State is a party to a custody proceeding, it initially must file a petition in a district court alleging the nature of the legal custodian's abuse or neglect. Section 41-3-401, MCA. After the submission of the petition, a court will then hold an adjudicatory hearing to determine if the child is a "youth in need of care." Section 41-3-404, MCA. If the child is determined to be a youth in need of care, the court will then set a date for a dispositional hearing. At the dispositional hearing, the court has the authority to transfer legal custody of the child. Section 41-3-406, MCA.
In this matter, such a petition was submitted. All five children were declared *1128 youths in need of care. However, the allegations of abuse and neglect were made in the context of the termination of parental rights of the then custodial parent, J.B[.]'s mother T.B. In addition to the rights parents may have as a couple, they also have individual rights with respect to their children. In re Matter of T.E.R. [, 180 Mont. 340, 346, 590 P.2d 1117, 1121 (1979) ].
The State did not petition for the termination of appellant's parental rights. Indeed, upon the termination of the mother's parental and custodial rights, appellant was entitled to custody of J.B. Babcock [v. Wonnacott , 268 Mont. 149, 152, 885 P.2d 522, 524 (1994) ].
...
We conclude that when the court terminated T.B.'s parental rights, she was unable to take custody of J.B. Therefore, appellant, the other parent, was entitled to custody. This entitlement is not immune from contest, but the contesting party, here DFS, must follow the proper procedure outlined above in order to obtain custody. A parent's right to custody in this situation is not so fleeting that it can hinge on a court's disposition of a related yet distinct matter. The District Court determined J.B. to be a youth in need of care and granted temporary custody to DFS based on its consideration of T.B.'s conduct toward the child; to relieve appellant of custody, the court was required to consider his conduct as well.
***535 In other words, in order to have the jurisdictional authority to award DFS temporary custody, the court must determine that J.B. is a youth in need of care. The court must make this determination on the basis of evidence of appellant's abuse or neglect.
...
DFS's original petition does not allege abuse or neglect on the part of appellant. However, both DFS and the court raised concerns about appellant's prior chemical dependency problems. Appellant stated and various examinations confirmed that he had not used alcohol or drugs for years. The concerns of DFS and the court were based largely on the results of a urinalysis in which appellant tested positive, but the record shows that the test results were incomplete and should properly have been considered inconclusive. In any event, these concerns clearly do not amount to a consideration of allegations of child abuse or neglect on the part of appellant, and do not provide a sufficient basis on which to conclude that J.B. would be in danger of harm or threatened harm. See [ In re Matter of M.G.M ., 201 Mont. 400, 408, 654 P.2d 994, 998 (1992) ].
The court failed to address any evidence of appellant's abuse or neglect of the child. "[A] finding of abuse, neglect, or dependency is the 'jurisdictional prerequisite for any court ordered transfer of custody.' " [ In re ] M.G.M. , 201 Mont. at 407, 654 P.2d at 998. (citations omitted). We hold that the District Court erred in concluding that J.B. was a youth in need of care, and therefore the court erred in granting DFS temporary custody.
In re J.B. , 278 Mont. at 162-64, 923 P.2d at 1098-99.
¶33 In In re S.S. , S.S. and S.S. were removed from mother's care. Consistent with its policy, the Department placed the children in the temporary care of father. Both parents stipulated to adjudication of the children as youths in need of care. At the dispositional hearing, the district court granted father's motion to dismiss the Department's case and grant him full legal custody. In affirming the district court's dismissal and grant of custody to father we noted the case arose,
from an abuse and neglect proceeding initiated by the State due to the alcohol abuse of Mother, who was divorced from Father. Mother's parental rights were not terminated. Instead, the District Court followed the statutory procedure of § 41-3-438(3)(d), MCA, in ordering placement of the children with Father. This relieved the State from any further obligation to the children, as the concern for them being youths in need of care was eliminated ***536 by the placement. See In re A.C. , [2004 MT 320, ¶ 17, 324 Mont. 58, 101 P.3d 761 ].
This is not to say that Mother does not have a remedy. Now that the State is no *1129 longer a party, Mother has the ability to initiate an action for a parenting plan pursuant to the provisions of Title 40, Chapter 4, MCA. That is the appropriate forum to invoke district court jurisdiction to resolve future disputes between the parents regarding these children.
In re S.S. , ¶¶ 16-17.
¶34 Finally, the provisions of the UCCJEA pertinent to this cause provide:
(1) A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.
...
(3) If there is a previous child custody determination that is entitled to be enforced under this chapter or a child custody proceeding has been commenced in a court of a state having jurisdiction under 40-7-201 through 40-7-203, any order issued by a court of this state under this section must specify in the order a period of time that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction under 40-7-201 through 40-7-203. The order issued in this state remains in effect until an order is obtained from the other state within the period specified or until the period expires.
Section 40-7-204(1) and (3), MCA.
Except as otherwise provided in 40-7-204, a court of this state may not modify a child custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under 40-7-201(1)(a) or (1)(b) and:
(1) the court of the other state determines it no longer has exclusive, continuing jurisdiction under 40-7-202 or that a court of this state would be a more convenient forum under 40-7-108; or
(2) a court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.
Section 40-7-203, MCA (emphasis added).
Except as otherwise provided in 40-7-204, a court of this state has jurisdiction to make an initial child custody determination only if:
...
***537 (b) a court of another state does not have jurisdiction under subsection (1)(a), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under 40-7-108 or 40-7-109[.]
Section 40-7-201(1)(b), MCA (emphasis added).
¶35 To provide effective assistance of counsel, attorneys representing parties and entities involved in abuse and neglect proceedings involving a non-offending, non-custodial parent must understand and assiduously advocate the legal framework set forth above.
Ineffective Assistance of Counsel
¶36 From the adjudication until her replacement shortly before Father's termination hearing, Father's initial counsel failed to render effective assistance which caused Father prejudice-termination of his parental rights to Child. At the outset, Father's counsel did not assiduously advocate for placement with Father despite the provisions of § 40-6-221, MCA, and the Department's policy that "the non-custodial parent is the first placement option for the child." Child and Family Services Policy Manual, § 304-1 (DPHHS 2014), https://perma.cc/95CE-7DBY. From the record, it appears Father had no issue with the Department working with Mother but it is clear he wanted Child placed in his care. The petition for emergency protective services, adjudication, and TLC contained no allegations of abuse or neglect against Father. At the adjudication in January 2017, although Father's counsel advised the District Court Father desired placement of Child with him, she did not assiduously advocate for this placement but instead acquiesced to the representations and position of the Department that immediate placement with Father was not possible. Counsel voiced *1130 no opposition to the Department's representation that an ICPC was required to place Child with Father. Counsel evidenced no knowledge or understanding of ICPCs, including Regulation No. 3, which provides exceptions to the need for an ICPC for placement with a parent from whom the child was not removed. At the time the Department claimed it had requested an ICPC, the Department had presented no evidence that Father was unfit or expressed any valid reason the exceptions under Regulation No. 3 did not apply. From the record before us, when the Department indicated it had requested an ICPC, the Department did not appear to have conducted any preliminary inquiry whatsoever into Father's situation, yet Father's counsel did not advocate the Department conduct a CPS history or criminal background check on Father. Counsel did not advocate for a courtesy check of Father's residence. Counsel did not advocate the ***538 Department take even minimal preliminary steps to ascertain Father's situation such as contact Father to obtain information regarding his employment, his residence and any individuals who resided with him in his home, his support system, his daycare/school plan, and collateral contacts; contact his employer to confirm his employment; contact identified individuals, if any, residing with Father; conduct a video chat with Father in order to see his residence; contact daycare/school personnel to confirm Father's plan; and the like. Counsel did not educate the court regarding exceptions to obtaining an ICPC with regard to placement of a child with a parent from whom the child was not removed (a non-offending parent). Counsel did not object to the ICPC, or advocate for a 30-day visitation with Father while sorting out the ICPC issue.[16] Upon stipulating to adjudication of Child as a YINC, counsel did not advocate for an immediate placement order with Father, superseding any existing custodial order and either dismissal of the proceeding with no further obligation on the part of the Department to work toward reunification with Mother or to keep the proceeding open pending Mother's completion of her treatment plan. Counsel did not request a placement hearing to require the Department to meet its burden to present documented evidence that Child should not be placed with Father because of safety concerns consistent with § 41-3-438, MCA, In re S.S. , and Department policy 304-1.
¶37 Even after acquiescing to an ICPC, Father's counsel did not further follow up regarding the status of the ICPC and did not learn the Department had not requested the ICPC as it previously claimed. Although the Department indicated in January 2017 it had already requested California do an ICPC, as of May 2017 when the California court queried its department, no request had been received by California. This issue, along with issues related to the UCCJEA, were discussed at hearing on August 9, 2017.
¶38 Upon receiving correspondence from the California court asserting jurisdiction was properly in California, the District Court issued an order to show cause for the parties to appear and "show cause why this Court should be vested with jurisdiction under the UCCJEA to determine the custody of [Child] or, in the alternative, why this action should not be dismissed in favor of the proceeding in the Superior Court of the State of California, San Diego County." Despite being ***539 placed on notice as to the jurisdictional issue, Father's counsel did not address any assertions made by the Department's counsel[17] and did not provide the court with any legal analysis of the UCCJEA supporting Father's desire that California retain jurisdiction. The District Court rightly expressed its frustration with counsel's lack of preparedness and valiantly attempted to go through the various provisions of the UCCJEA in open court. In doing so, the District Court concluded California was the home state with initial jurisdiction and then determined jurisdiction should be *1131 transferred to Montana as the most convenient forum. Although the UCCJEA clearly contemplates that the state having initial jurisdiction-here, California-is the state that determines if it no longer has exclusive, continuing jurisdiction or that another state would be a more convenient forum, Father's counsel did not educate the District Court in this regard and failed to object when the Montana court, rather than the California court, determined that Montana was the most convenient forum.[18]
¶39 More concerning, after the District Court considered the factors set forth in § 40-7-108, MCA, to determine the most convenient forum, Father's counsel again failed to advocate for the immediate placement of Child with Father when the District Court concluded, "I haven't heard any representation, offer of proof, or evidence today that would suggest that California is a place where there would likely be domestic violence.... I found no convincing evidence or record-based representation which suggests that [Child] would be subjected to a home life marked by domestic violence were she to reside in California."
¶40 On August 25, 2017, at hearing on the Department's petition for extension of TLC, Father and his counsel learned that California had rejected doing an ICPC because Father was the noncustodial parent and did not have a treatment plan. The Department then suggested the best course of action would be development of a treatment plan for Father. Father's counsel did not inform the District Court that the ***540 representation from the California department may have meant that California understood that, pursuant to ICPC Regulation No. 3, no ICPC was required for placement with a non-offending parent rather than an affirmative request by California that Father be required to complete a treatment plan. Again, counsel did not request immediate placement with Father or even request a placement hearing and did not object to requiring Father to be subject to a treatment plan which, by its nature, would delay reunification; result in time, expense, and inconvenience to Father; and risk termination of his parental rights if not completed to the Department's satisfaction.
¶41 At the treatment plan hearing on November 3, 2017, Father expressed opposition to the necessity of a treatment plan and the District Court questioned Father's counsel, asking "given the position just stated by your client, [counsel], how do you believe it's best appropriate to proceed?" Counsel responded, "I'm not sure." The Department's counsel explained to the court that if Father had a treatment plan, then an ICPC could be obtained and advised the court that lack of a treatment plan had been the hold up to the ICPC. The Department's counsel admitted Father was a non-offending parent explaining, "It's always difficult when a non-offending parent is living out of state, but there are things which have to be done to ensure the child can be safely placed with that parent. We don't have the authority to do it through Montana, it has to come from the home state, and until we can assure stable housing, stable income, no mental health issues or concerns or drug concerns that's the purpose of the ICPC and that's the purpose of the treatment plan, is to gain the information that we lack." Father's counsel completely failed to address these inaccurate assertions. Again, Father's counsel failed to educate the District Court that an ICPC was not required pursuant to ICPC Regulation No. 3, and that the Department was fully capable of conducting and should have already conducted preliminary inquiry to gain information regarding Father's CPS history and criminal background, housing, and employment to determine if further inquiry or investigation was indicated. Father's counsel failed to advocate that the court had already determined the Department had failed to present any evidence indicating a safety issue for Child were she to reside with Father in California. Having been misled to believe the only way the Department was able to obtain any information about Father and his living situation *1132 or to place Child with Father was for Father to have a treatment plan so that California would do an ICPC, the District Court advised Father that this was the only way to proceed and then asked Father if he would sign the treatment plan. Faced with this Hobson's ***541 choice, with no objection or contrary information provided by his counsel, Father agreed to the treatment plan. At this point in time, other than asserting a remote history of a drug conviction over 15 years prior, the Department had presented no evidence which would reasonably indicate any current or ongoing drug use requiring further investigation or treatment and had presented no evidence which would indicate a mental health issue or ongoing domestic violence issue requiring treatment. Despite this, Father's counsel not only failed to object to imposition of a treatment plan but then failed to even object to any of the tasks proposed in the treatment plan.[19]
¶42 Having permitted Father to agree to the treatment plan proposed by the Department, Father's counsel then had an obligation to assist Father in working with the Department to accomplish the tasks of a treatment plan. Despite this, Father's counsel did not follow up with the Department regarding its referrals for services, did not regularly maintain contact with Father to facilitate his timely compliance with the treatment plan, and did not seek an order or confirmation of task completion or confirmation of such when Father received email and verbal communication from Father's CPS that certain tasks were no longer being required.
¶43 At the status hearing of February 16, 2018, when the District Court explained to Father the Department believed he was not cooperating, Father again reiterated he did not understand the Department's case as he did not believe the Department had established any abuse or neglect on his part and also expressed his belief that he had already completed the treatment plan tasks as they were originally required by the court in California in connection to his parenting case. During the hearing, the Department appeared to accept that Father's prior domestic violence prevention program satisfied the treatment plan's requirement that Father complete domestic violence counseling, but then faulted Father for not obtaining a mental health evaluation. Father then reported CPS Lindal had ***542 previously sent him an email stating he did not have to complete the mental health evaluation. This was confirmed by CPS Lindal. Despite this discussion and lack of presentation of any new evidence indicating mental health concerns, the Department's attorney asserted the Department wanted Father to complete a mental health evaluation. Following which, the District Court noted that hearing no more objections from Father, Father should do domestic violence counseling and a mental health evaluation. Throughout nearly the entirety of this hearing, Father's counsel was silent and non-participatory. She failed to advocate Father's completion of tasks, failed to clarify the confusion from the discussion as to exactly which tasks the Department believed Father had successfully completed and which tasks it believed he had not completed, and failed to clarify which tasks remained incomplete and what was needed to certify their completion.
¶44 Throughout the various proceedings in this case, Father's counsel provided little advocacy or input, which was understandably frustrating to the District Court.[20] The majority *1133 of discussion as to Father's position at hearings occurred between the court and Father directly without much input or participation from Father's counsel.
Counsel's Ineffective Assistance Prejudiced Father
¶45 Counsel's lack of investigation of the case, lack of research and understanding of the law, lack of regular contact with Father, and lack of assiduous advocacy for Father prejudiced Father. Father was prejudiced by counsel's lack of early investigation into his history and circumstances as counsel was unable to provide information to the Department to expeditiously make initial inquiry into Father's background, work situation, and living arrangements and then failed to request the Department make an early preliminary investigation into Father's circumstances or assiduously advocate for immediate placement of Child with Father. Father was prejudiced by counsel's lack of advocacy for immediate placement and, at a minimum, to advocate for a placement hearing where Father could require the ***543 Department meet its burden to present documented evidence that his recent or current behavior and situation presented an imminent, observable safety risk to Child precluding immediate placement with him. Father was prejudiced by counsel's lack of research or understanding of the law related to his right to parent and ICPC regulations and lack of advocacy regarding the ICPC and exceptions thereto which led the District Court to erroneously believe Child could not be placed with Father without imposition of a treatment plan. Father was prejudiced by the imposition of a treatment plan as at the time it was ordered the Department had not presented evidence of recent or current abuse or neglect on Father's part or current behaviors or living situation demonstrating need for imposition of a treatment plan. Father was further prejudiced upon imposition of the treatment plan by his counsel's failure to object to tasks Father believed he had already accomplished or were not warranted by the documented evidence presented by the Department and by counsel's failure to advocate for tasks designed to provide the Department with the information it asserted it lacked regarding Father. Finally, Father was prejudiced throughout the case by counsel's failure to regularly follow up with Father and the Department to determine Father's progress, to address the Department's stated concerns, to assure ongoing visitation and contact between Child and Father, to request increased contact between Child and Father and address any issues regarding visitation prior to a termination hearing, to request mediations, or to request an alternative to termination such as guardianship. Given the importance of Father's constitutional liberty interest to parent, counsel's investigation of the case, research and understanding of the law, interaction with Father, and overall advocacy fell short and did not constitute effective assistance of counsel.
¶46 It is appropriate to reverse Father's termination of parental rights and rewind proceedings in this case. At the time of adjudication, given Mother's parental rights remained intact, and in light of In re S.S. , it was appropriate for Father to stipulate to adjudication as he and his counsel would have at that time had a reasonable belief the Department would look to placing Child with him and the court would look to disposing of the cause pursuant to § 41-3-438(c) or (d), MCA. Thereafter, counsel's advocacy fell short as outlined above.[21] Therefore, ***544 we conclude it appropriate to rewind this case to the point where the District Court accepted Father's stipulation for adjudication and adjudicated Child as a YINC. However, as Mother's parental rights were terminated in the *1134 interim, consistent with our holding in In re J.B. , to maintain TLC the court must determine that Child is a youth in need of care on the basis of evidence of Father's abuse or neglect. To make that determination, the Department will need to conduct investigation of Father along a continuum, if necessary, as outlined in ¶¶ 29-31 above.
¶47 As we did in In re R.J.F. , 2019 MT 113, 395 Mont. 454, 443 P.3d 387, we recognize there are no easy decisions in child dependency cases. In re R.J.F. , ¶ 47. Courts struggle with balancing the child's interest in permanency and stability against the parent's fundamental rights to parent. Many times, these struggles are inadvertently compounded by general uncertainty and apprehension toward a non-offending or non-custodial parent who has not historically had regular and continuous contact with the subject child.[22] While we understand this, we cannot, based on generalized apprehensions, ignore or eliminate a parent's fundamental liberty interest to parent when the parent has not received what the law guarantees. Given the unique circumstances herein, the amount of time Child has resided with grandmother, and Child's history of stress and instability, we encourage the parties to engage in mediation and work collaboratively to establish a positive living arrangement for Child.
CONCLUSION
¶48 Father's initial appointed counsel did not render effective assistance of counsel. Because of counsel's IAC, Father was prejudiced and his parental rights were terminated. We reverse the termination of Father's parental rights, rewind this case to the point where the District Court accepted Father's stipulation for adjudication and adjudicated Child as a YINC, and remand to the District Court for further proceedings consistent with this opinion.
¶49 Reversed and remanded.
We concur:
MIKE McGRATH, C.J.
JAMES JEREMIAH SHEA, J.
LAURIE McKINNON, J.
BETH BAKER, J.
DIRK M. SANDEFUR, J.
JIM RICE, J.

Unfortunately, no subsequent telephonic conference was held between the judges where the parties and their counsel could have an opportunity to be present and participate. This would have permitted more in-depth discussion as to the issues between the parties in California, each parent's compliance with prior court orders, the UCCJEA requirements, and a clearer picture as to which court should have continuing jurisdiction and how the parties would move forward with the cause.

This was, however, mentioned by Department's counsel.

Presumably the Department had not developed a treatment plan for Father as there were no allegations of abuse or neglect against Father.

The fact that Father had a history of a felony drug conviction related to the sale of methamphetamine occurring over 15 years before the Department became involved with this family-and for which Father was released from supervision prior to Child's birth-was known and discussed at the November 3, 2017 hearing where the Department admitted Father was "a non-offending" parent. The fact that Father had previously been restrained from contact with Mother was known and discussed at hearing on August 9, 2017, at the completion of which the District Court concluded it had not heard any representation, offer of proof, or evidence that if Child were placed with Father in California there would likely be domestic violence.

No items were noted under "Needs improvement/areas of concern" and the "Comments/Recommendations" at the conclusion of the report states, "Client completed 52 weeks long DVIP program. Client participated in a group discussion and he often offered constructive feedback to other group members. Client however remains firm in his believe [sic] that he does not belong in DVIP program and he does not admit to any abusive/aggressive behavior in the past." The program defined expectations as to participation to be: "Arrives on time, attentive, asks questions, constructive contribution to group discussions, willingness to voluntarily participate, initiates constructive dialogue, appropriately challenges others." It also defined expectations regarding attitude: "Uses respectful language, demonstrates gender respect, respect for group processing and other members, accountability for actions, consistent modeling of positive changes in behavior and attitude, maintains self-confidence and commitment to non-violence." Father's participation and attitude were noted to be "At Expectation."

We note that Mother was determined to be the aggressor in the domestic violence event which prompted the Department's removal of the children from her care.

Such as contacting Father and his identified collateral contacts, contacting Father's employer, contacting Father's landlord, or asking Father to secure a third-party home study.

The Department had earlier taken the position that maintaining Child's relationship with her half-siblings weighed against placing her with Father.

This testimony is consistent with the information previously provided by the California court.

Father asserts deficiency in investigation, research and knowledge of the law, hearing preparation, and zealous advocacy, rather than lack of specific training or experience. As such, we limit our review to the areas of deficiency addressed in the briefing and do not address counsel's specific training or experience in DN work.

Section 40-4-221, MCA, provides for determination of a child's care upon death of a parent and is not applicable to this case.

For example, the Department may request documents such as pay stubs, rental agreements, or other housing information, etc. from the non-custodial parent.

Depending on the particular identified circumstance, the CPS worker may, for example, conduct a home visit, or if the non-custodial parent lives outside the jurisdiction, request a courtesy check by the Department serving the non-custodial parent's residential area, request drug testing if there is indication of unstable or erratic behaviors related to current drug use, etc.

Examples of such evaluation may include an in-depth home study or professional evaluation.

This is consistent with modification of a parenting plan in a family law case. If a parenting plan does not find either parent unfit, but allocates more parenting time to one parent such that that parent is the primary custodial parent, if the custodial parent's circumstances change and he or she is no longer able to provide a safe, stable environment for a child, a court may modify the parenting plan to provide such that the previous non-custodial parent becomes the primary custodial parent.

Pursuant to Department policy 402-7, no ICPC is required to effectuate a visitation of 30 or fewer days. See Child and Family Services Policy Manual, § 402-7 (DPHHS 2014), https://perma.cc/YK4Q-4VJS.

For example, Department's counsel asserted the UCCJEA was trumped because of the Title 41 DN filing. Father's counsel did not contest this assertion despite the clear provision of § 40-7-103(4), MCA, which defines child custody proceeding to include any "neglect, abuse, [or] dependency" proceeding.

This lack of legal knowledge and advocacy likely would not have resulted in California maintaining jurisdiction given the California court's initial communication indicating, "If in fact Montana is exercising a more permanent jurisdiction under the UCCJEA, I would appreciate knowing that and I would be happy to transfer jurisdiction to Montana."

For example, given the representations of the Department's counsel as to the information the Department needed, Father's counsel could have appropriately advocated for tasks such as providing the Department, in both Montana and California, with copies of his pay stubs, bank or financial statements, and rental agreement within a designated time period; requiring Father to physically go to the Department in California to set up an in-person meeting; or requiring Father to obtain an independent home study from an agreed upon private provider; and the like-tasks designed to obtain the information the Department indicated it did not have and secure Father's cooperation with an ICPC as opposed to tasks requiring chemical dependency, mental health, and domestic violence interventions.

On one occasion, after Father expressed his objection to the delay in requesting the ICPC, that he did not understand how a treatment plan was necessary for him when there were no allegations of abuse or neglect pertaining to him in the court paperwork, he felt his rights had been violated, and he was not afforded the same opportunities as Mother had been afforded since the beginning of the proceedings, the District Court expressed its concern, "[Counsel] do you wish to encapsulate your client's objections? I mean when he's sitting here with counsel it leaves me at a loss to understand why I should be taking his legal arguments from him and not from you." After briefly consulting her client, Father's counsel replied, "It's hard for me to tell, Your Honor, because I don't quite get it."

As we have concluded Father's initially appointed counsel did not render effective assistance throughout the proceedings through to her replacement shortly before the termination hearing such that reversal and remand is appropriate, we do not address IAC issues asserted with regard to Father's subsequent counsel.

Placement with such a parent would be no more disruptive to a child than placement in a foster care setting-a practice in which the Department regularly engages.