FILED

10/31/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0157

DA 23-0157

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 202

IN THE MATTER OF:

Z.N.-M.,

       A Youth in Need of Care.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DDN-18-110
Honorable Christopher D. Abbott, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Robin Meguire, Meguirelaw.com, Great Falls, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

      Kevin Downs, Lewis and Clark County Attorney, Ann Penner, Deputy County Attorney, Helena, Montana

Submitted on Briefs:  September 27, 2023

Decided:  October 31, 2023

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

## ISSUES

¶1 T.N. (Mother) appeals the First Judicial District Court's order terminating her parental rights to her daughter Z.N.-M. We restate the issues on appeal as follows:

*Issue 1: Whether the District Court committed reversible error when it determined that there was no reason to know Z.N.-M. was an Indian child under the Indian Child Welfare Act (ICWA).*

*Issue 2: Whether the District Court failed to properly adjudicate Z.N.-M. as a youth in need of care.*

*Issue 3: Whether the termination of Mother's parental rights must be reversed because she received ineffective assistance of counsel.*

*Issue 4: Whether the District Court abused its discretion by ordering termination of parental rights instead of a guardianship.*

¶2 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 In 2018, upon finding probable cause to believe that five-year-old Z.N.-M. was in immediate or apparent danger, the Montana Department of Health and Human Services, Child and Family Services Division (the Department), removed Z.N.-M. from Mother's care.[1] Tammara Rosenleaf, a Child Protective Specialist (CPS) with the Department, attested that Mother had left Z.N.-M. with a stranger overnight following a domestic disturbance between Mother and her then-boyfriend. Z.N.-M. had bruising on both sides of her face and told Rosenleaf that her mother's boyfriend had thrown her into Mother. Rosenleaf attested that she inquired with both Mother and Z.N.-M.'s father, D.M., as to

---

[1] Only Mother's rights are at issue on appeal, as Z.N.-M.'s father is deceased.

their tribal membership. Both informed Rosenleaf that they were not members of any Indian tribe. Through prior interaction with the family, the Department had learned from D.M. that, though not a member, he had an affiliation through his mother with the Blackfeet Tribe. By the time of the incident in question, however, the Department had received a conclusive determination from the Blackfeet Tribe that Z.N.-M. was not eligible for membership. The District Court granted the Department emergency protective authority and Z.N.-M. was placed in therapeutic foster care.

¶4 On January 29, 2019, the District Court held a hearing for the purpose of adjudicating Z.N.-M. as a youth in need of care (YINC) and to grant the Department temporary legal custody (TLC) of Z.N.-M. for a period not to exceed six months. Mother and her attorney, Mr. Bell, were both present for the hearing. At the hearing, the District Court adjudicated Z.N.-M. as a YINC and granted TLC of Z.N.-M. to the Department. Following the hearing, the court approved a treatment plan that required Mother to attend parenting classes, undergo substance abuse and mental health screenings, refrain from using alcohol or illicit drugs, participate in individual and family therapy, maintain sufficient housing and income, and stay in stable contact with the Department.

¶5 Over the ensuing months, Mother had successes and setbacks. At times, particularly when Mother was able to obtain stable income and housing, Mother made progress with her own mental health, substance abuse, and parenting. At other times throughout 2021 and 2022, however, Mother lost housing and moved between Helena, Butte, and Anaconda. The instability of displacement was challenging for both Mother and Z.N.-M. During

periods of unstable housing, Mother frequently would miss her counseling appointments, and Z.N.-M. would often be tardy or absent from school. Additionally, Z.N.-M. suffered greatly from the disruption and lack of permanency associated with frequent moving, which exacerbated her existing behavioral issues.

¶6 Mother's inability to accomplish the tasks of her treatment plan had an outsized impact on Z.N.-M. As the District Court noted, Z.N.-M. struggles from diagnosed post-traumatic stress disorder and is easily emotionally dysregulated. The court found that Z.N.-M. responded well to structure, stability, routine, and clear boundaries. When provided with the stability of foster homes, Z.N.-M.'s behavior showed marked improvement and her attendance at school was near perfect. When provided with consistent structure and routine, Z.N.-M.'s aggressive and defiant behaviors diminished.

¶7 On May 6, 2021, the Department filed a petition to terminate Mother's parental rights based on Mother's failure to complete her treatment plan. Following several continuances, the District Court held a hearing on January 10, 2022. Prior to the hearing, Mother suggested that Z.N.-M. was a member of or eligible for membership in Indian tribes other than the Blackfeet Tribe. In April 2021, Mother raised the possibility that Z.N.-M. was a member of the Northern Cheyenne Tribe. In December 2021, Mother reiterated that Z.N.-M. was a member of the Northern Cheyenne Tribe and may be a member of an Alaskan Native tribe and the Little Shell Tribe. Then, at the January 10, 2022 hearing, Mother's counsel, Ms. Erickson, raised for the first time the possibility that Z.N.-M. may be eligible for membership in the Chippewa Cree of the Rocky Boy's Reservation.

4

Mother's claims of Z.N.-M.'s eligibility in the Northern Cheyenne, Alaskan Native, or Little Shell Tribes were based on the ancestry of D.M.'s mother—the same familial affiliation as the Blackfeet Tribe. Erickson's assertions appeared to be based on her own research into the genealogy of Mother and D.M. The District Court postponed the termination hearing, and the Department undertook efforts to determine whether Z.N.-M. was eligible for enrollment in any of the identified tribes. The Department sent notice of the proceedings to each. None of the tribes responded in writing to the notice, nor did any attempt to intervene in the proceedings at any time. Based on testimony that the tribes had verbally confirmed Z.N.-M.'s ineligibility, the District Court held that Z.N.-M. was not an Indian child under ICWA.

¶8 On February 10, 2022, the Department returned Z.N.-M. to Mother's care for a trial home visit. The Department withdrew its petition to terminate parental rights, and Mother stipulated to an extension of TLC for an additional six months. For a brief time, Mother was successful in caring for Z.N.-M. Unfortunately, Mother's progress was not lasting. During the trial home visit, Z.N.-M. repeatedly was tardy or absent from school. In July 2022, Mother lost housing and was forced to move into a hotel. Following her disruption in housing, Mother began to skip her chemical dependency counseling and repeatedly tested positive for methamphetamine.

¶9 On August 22, 2022, the Department terminated the home visit, removed Z.N.-M. from Mother's care, and again moved to terminate Mother's parental rights. On November 21, 2022, the District Court held a hearing on the second petition to terminate.

5

Following the hearing, the District Court found that Mother was unable to ensure the stability, safety, and security that Z.N.-M. required. Mother's housing insecurity and lack of income left her incapable of providing a routine and stable home environment for Z.N.- M. Recognizing Mother's commendable efforts to improve her own mental health and her struggle with drug addiction, the District Court held nonetheless that it was in Z.N.-M.'s best interest to terminate Mother's parental rights. The District Court granted full legal custody of Z.N.- M. to the Department with the right to consent to adoption or guardianship. Mother appeals.

**STANDARDS OF REVIEW**

¶10 The determination to terminate parental rights is reviewed for an abuse of discretion under the applicable standards of Title 41, Chapter 3, MCA, and 25 U.S.C. § 1901, ICWA. *In re L.D.*, 2018 MT 60, ¶ 10, 391 Mont. 33, 414 P.3d 768. A district court abuses its discretion if it acts arbitrarily, without conscientious judgment, or in an unreasonable fashion that results in substantial injustice. *In re A.G.*, 2005 MT 81, ¶ 12, 326 Mont. 403, 109 P.3d 756. Section 41-3-609, MCA, requires a district court to make specific factual findings prior to terminating parental rights. We review those factual findings for clear error. *In re J.C.*, 2008 MT 127, ¶ 34, 343 Mont. 30, 183 P.3d 22. Findings of fact are clearly erroneous if they are not supported by substantial evidence, the district court misapprehends the effect of the evidence, or this Court has a definite and firm conviction that the district court was incorrect. *In re D.D.*, 2021 MT 66, ¶ 9, 403 Mont. 376, 482 P.3d

6

1176. This Court exercises de novo review of claims of ineffective assistance of counsel. *In re B.M.*, 2010 MT 114, ¶ 14, 356 Mont. 327, 233 P.3d 338.

**DISCUSSION**

¶11    *1. Whether the District Court committed reversible error when it determined that there was no reason to know Z.N.-M. was an Indian child under ICWA.*

¶12    ICWA is the legislative embodiment of Congressional determination that the interests of Indian children are best served when the relationships between Indian children and Indian tribes are protected and preserved.  25 U.S.C. § 1901, *et seq*; *In re S.R.*, 2019 MT 47, ¶ 11, 394 Mont. 362, 436 P.3d 696 (citing *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 49-53, 109 S. Ct. 1597, 1609-11 (1989)).  Because raising Indian children in Indian homes is instrumental to the transmission of tribal heritage, ICWA governs state court adjudications of Indian child custody "from start to finish."  *Haaland v. Brackeen,* 599 U.S. ___, ___, 1436 S. Ct. 1609, 1623 (2023).  Consistent with its responsibility to "protect[] Indian children," and in recognition of the states' longstanding failure to "recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families," the United States Congress included in ICWA stringent requirements for the termination of parental rights in cases involving Indian children.  25 U.S.C. § 1901(3), (5).

¶13    As relevant here, ICWA applies to any child custody proceeding in which the custody of an Indian child is at issue.  *See* 25 C.F.R. § 23.103 (2023).  Actions under Title 41, Chapter 3, MCA, are child custody proceedings and must comply with ICWA when an Indian child is involved.  *In re L.D.*, ¶ 12.  The act broadly defines an Indian child as "any

unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). In addition to a broad definition of an Indian child, ICWA requires the state to show beyond a reasonable doubt, prior to any termination of parental rights, that "the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). By contrast, § 41-3-609(1), MCA, allows for the termination of parental rights where appropriate findings are made by clear and convincing evidence.

¶14 Because of the heightened safeguards ICWA affords, a state district court must determine prior to any adjudication of child custody or parental rights whether a child is an Indian child under the law. *In re L.D.*, ¶ 13. Questions of eligibility and tribal membership are the sole province of the Indian Tribes. *In re A.G.*, ¶ 13 (citing *Adams v. Morton*, 581 F.2d 1314, 1320 (9th Cir. 1978)). As the "ultimate authority on eligibility," an Indian tribe's determination that a child is a member or is eligible for tribal membership is conclusive as a matter of law. *In re Adoption of Riffle*, 273 Mont. 237, 242, 902 P.2d 542, 545 (1995). As such, the only determinations for a Montana district court to make are (1) whether there is reason to know that a child may be an Indian child, and (2) whether an Indian tribe has determined that the child is a member or is eligible for membership in the tribe. *In re L.D.*, ¶ 14. If there is reason to know a child may be an Indian child, terminating parental rights without a conclusive determination of tribal membership or eligibility is an abuse of discretion. *In re L.D.*, ¶ 14; *see also* 25 U.S.C. § 1912(a). "What constitutes a

reasonable basis upon which to believe that a child may be eligible for tribal enrollment is a factual matter that will vary based on the particular record in each case." *In re S.R.*, 2019 MT 47, ¶ 20, 394 Mont. 362, 436 P.3d 696. The standard does not require "that an assertion of potential tribal eligibility be certain," but does call for "more than a bare, vague, or equivocal assertion of possible Indian ancestry." *In re S.R.*, ¶ 21.

¶15 The record in this case shows that both Mother and D.M. reported in 2018 that they were not members of any Indian tribe. Because of D.M.'s previous representations, the Department already had obtained a conclusive determination from the Blackfeet Tribe that Z.N.-M. was not a member of, nor was she eligible for membership in, that Tribe. At various times throughout these proceedings, Mother raised the possibility that Z.N.-M. was eligible for membership in several other tribes. In response, the Department sent notice of the proceedings and requests for confirmation of membership to the Northern Cheyenne, Chippewa Cree, and Little Shell Tribes. Though none of the tribes responded in writing, Z.N.-M.'s CASA testified that all three Tribes provided verbal confirmation that Z.N.-M. was neither a member of nor eligible for membership in those Tribes.

¶16 As Mother points out, verbal confirmation is, on its own, insufficient to satisfy the rigors of ICWA. *In re D.E.*, 2018 MT 196, ¶ 26, 392 Mont. 297, 423 P.3d 586. In *In re D.E*, a CPS included statements in his affidavits supporting the petition for YINC and TLC indicating the children may be Indian children because their birth father was an enrolled member of the Blackfeet Tribe. *In re D.E.*, ¶¶ 5, 8. Despite having reason to know that the children may be subject to ICWA, the Department never sought or received any

9

conclusive determination that the children were not Indian children. *In re D.E.*, ¶ 26. Instead, the Department contended that the CPS had made oral contact with someone from the Blackfeet Tribe who told him the children were not eligible. *In re D.E.*, ¶ 26. We reversed the District Court's termination of the mother's parental rights, holding that the Department failed to satisfy its burden under ICWA where it had reason to know from the outset of the case that the children may be subject to ICWA but never made any formal inquiry with an Indian tribe to seek a conclusive determination regarding membership. *In re D.E.*, ¶¶ 26-28.

¶17 When Rosenleaf removed Z.N.-M. from Mother's care in 2018, she inquired with both Mother and D.M. as to their tribal status. Both parents told Rosenleaf that they were not members of any Indian tribe. At that time, the Department already knew Z.N.-M. was not eligible for membership with the Blackfeet Tribe. The only other suggestion that Z.N.-M. may be a member of a different tribe other than the Blackfeet Tribe arose from Mother's later assertions and Erickson's internet research into the genealogy of Mother and D.M. Though little more than bare assertions, the Department sent notice to each possible affiliated tribe, and none attempted to intervene at any point in these proceedings. The CASA pursued the inquiry and testified that all confirmed Z.N.-M.'s ineligibility. Based on the information provided by the parties, the District Court determined that it lacked reason to know that Z.N.-M. was an Indian child, and the enhanced procedural protections of ICWA did not apply. The State acknowledges, and we agree, that the Department has an obligation under the law to obtain a tribe's conclusive determination of

ineligibility when there is reason to know a child may be an Indian child. On this record, however, Mother has not shown clear error in the District Court's finding that it had no reason to know that Z.N.-M. met that definition.

¶18 Finally, the requirements of ICWA are not jurisdictional and are subject to harmless error review. *In re D.D.*, ¶ 11. We have found harmless error regarding a district court's failure to comply with ICWA's notice requirements where there was not "a reasonable probability that the appellant would have obtained a more favorable result in the absence of the error." *In re S.B.*, 2019 MT 279, ¶ 32, 398 Mont. 27, 459 P.3d 214 (quoting *In re M.S.*, 2014 MT 265A, ¶ 22, 376 Mont. 394, 336 P.3d 930). In *In re S.B.* we declined to hold the court in error where the child's tribe was noticed and aware of the proceedings and chose not to participate. ¶ 34. Here, the suggestion of additional tribal affiliations was weak at best, and the record demonstrates a decision by the Little Shell, Chippewa Cree, and Northern Cheyenne Tribes not to participate in the proceedings after being provided proper notice. Mother has not shown that the Department's failure to insist on a written response prejudiced her substantial rights.

¶19 *Issue 2: Whether the District Court failed to properly adjudicate Z.N.-M. as a youth in need of care.*

¶20 Mother next argues that the District Court committed reversible error by terminating her parental rights without following prescribed procedures when it adjudicated Z.N.-M. as a youth in need of care. Mother contends that the record does not demonstrate her stipulation to YINC adjudication and the District Court therefore did not comply with

statutory requirements for the termination of parental rights.[2] Mother directs the Court's attention to the January 29, 2019 hearing at which the District Court purportedly adjudicated Z.N.-M. as a YINC. During that hearing, the following colloquy took place between the Department's attorney Peterson and Mother's counsel Bell:

> MS. PETERSON: With respect to [Mother], it's my understanding from Mr. Bell that she is present today and is prepared to stipulate to adjudication of [Z.N.-M.] as a youth in need of care and, in addition, allowing the Department to have custody for a period not to exceed six months.
>
> .   .   .
>
> MR. BELL: Your Honor, Ms. Peterson's representations are correct . . .

¶21 A short time later, the District Court addressed Mother directly:

> THE COURT: [D]o you understand that you have a right to a hearing on the Department's request to establish temporary legal custody [for] six months . . .?
> MOTHER: Yeah, I do.
>
> .   .   .
>
> THE COURT: So by your agreement to the Department's petition, we won't have that hearing. It'll just go forward based on your agreement that you've made - -
> MOTHER: Agree
>
> .   .   .
>
> THE COURT: So, it's your voluntary choice then not to have that hearing, is that correct?
> MOTHER: That is correct, sir.

---

[2] Mother argues additionally that ICWA requires any voluntary termination of parental rights be made in writing and that because she did not stipulate to the YINC designation in writing it is invalid. *See* 25 U.S.C. § 1913(a). Because we affirm the District Court's ruling that ICWA did not apply, 25 U.S.C. § 1913(a) is inapplicable.

THE COURT: Very well. I will grant the Department's petition then for temporary legal custody for up to six months and direct the Department to come up with a treatment plan and then to work with [Mother]. . . .

¶22 Mother points out that the only mention of YINC adjudication was in the dialogue between Peterson and Bell. Mother argues that because the Court never mentioned or discussed with her the legal definition and consequences of YINC adjudication, any waiver could not have been knowing or intelligent. Because her waiver was not valid, Mother argues, the District Court lacked jurisdiction to terminate her parental rights under § 41-3-609, MCA.

¶23 The Department responds that Mother was fully apprised of the consequences of YINC adjudication at the hearing. The Department draws our attention to the portion of the hearing in which the District Court explained to Mother that she was stipulating to the Department's petition. The Department's petition included the request for YINC adjudication. The Department points further to copies of the petition for YINC adjudication and TLC that were served on Mother and her attorney and argues that Mother was fully notified of its contents.

¶24 Parents have a fundamental liberty interest in the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000); *In re A.S.*, 2004 MT 62, ¶ 12, 320 Mont. 268, 87 P.3d 408. Under both the Fourteenth Amendment of the Constitution of the United States and Article II, § 17 of the Constitution of the State of Montana, due process requires that the state provide fundamentally fair procedures for the termination of parental rights. *See Santosky v. Kramer*, 455 U.S. 745, 753-54, 102 S.

13

Ct. 1388, 1394-95 (1982); *In re A.S.A*, 258 Mont. 194, 197-98, 852 P.2d 127, 129 (1993). Fundamental fairness, in turn, requires that the party seeking termination prove all statutorily required elements prior to termination. *In re J.C.*, ¶ 35 (citing *In re Custody & Parental Rights of M.W. & C.S.*, 2001 MT 78, ¶ 4, 305 Mont. 80, 23 P.3d 206).

¶25    The elements required for the termination of parental rights in Montana are codified in § 41-3-609, MCA, which in pertinent applicable part requires that "the child is an adjudicated youth in need of care." Section 41-3-609(1)(f), MCA. A youth in need of care is a youth who "has been adjudicated or determined, after a hearing, to be or to have been abused, neglected, or abandoned." Section 41-3-102(35), MCA. In addition to adjudication after a hearing, Montana law allows parents to stipulate that their child meets the YINC definition by a preponderance of the evidence. Section 41-3-434(1), MCA. Such stipulation can satisfy the statutory requirements of § 41-3-609(1)(f), MCA. *In re J.M.*, 2009 MT 332, ¶ 22, 353 Mont. 64, 218 P.3d 1213 (citations omitted). Whether by stipulation or by hearing, YINC adjudication is a threshold statutory requirement for the termination of parental rights. *In re M.O. and M.O.*, 2003 MT 4, ¶ 12, 314 Mont. 13, 62 P.3d 265 (citing *In re T.C.*, 2001 MT 264, ¶ 15, 307 Mont. 244, 37 P.3d 70; *In re M.J.W.*, 1998 MT 142, ¶ 11, 289 Mont. 232, 961 P.2d 105).

¶26    Jurisdiction refers to a court's authority to adjudicate a case before it. A court's subject matter jurisdiction describes the "fundamental authority to hear and adjudicate a particular class of cases or proceedings." *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 57, 345 Mont. 12, 192 P.3d 186 (citations omitted). In cases of child neglect, Montana district

14

courts derive subject matter jurisdiction from the Montana Constitution. *In re K.B.*, 2016 MT 73, ¶ 14, 383 Mont. 85, 368 P.3d 722. District courts have original subject matter jurisdiction over "all civil matters and cases at law and in equity." Mont. Const. art. VII, § 4. A district court's jurisdiction is, therefore, extremely broad and includes issues of child custody and parental rights, which are civil matters. *In re K.B.*, ¶ 13. Jurisdiction and threshold statutory requirements are separate and distinct. *In re K.B.*, ¶ 12. A district court's failure to comply with statutory requirements does not deprive the court of its constitutionally granted subject matter jurisdiction. *In re E.G.*, 2014 MT 148, ¶ 12, 375 Mont. 252, 326 P.3d 1092; *In re K.B.*, ¶¶ 12-14.

¶27 Mother's argument that the District Court failed to comply with the requirements of §§ 41-3-437 and 41-3-609(1)(f), MCA, does not call into question its jurisdiction to decide the case. Mother directs the Court's attention to prior decisions in which we described YINC adjudication as a jurisdictional requirement. *In re M.W. & C.S.*, ¶ 46 ("For the District Court to have jurisdictional authority to award [the Department] custody of M.W. and C.S., the court needed to determine that they were youths in need of care."). As the State points out, this confusion appears to stem from our decision in *In re J.B.*, 278 Mont. 160, 923 P.2d 1096 (1996). We stated there that a district court's jurisdictional authority hinged on the "[determination] that J.B. is a youth in need of care" and described the determination as a "jurisdictional prerequisite." 278 Mont. at 164, 923 P.2d at 1098-99. Following *In re J.B.*, a string of cases similarly described YINC adjudication as a jurisdictional threshold. *In re A.B.*, 2001 MT 60, ¶ 39, 304 Mont. 379, 22 P.3d 185 ("the

15

legal determination that a child is a youth in need of care is first and foremost a jurisdictional prerequisite for any court-ordered temporary transfer of custody"); *In re Custody & Parental Rights of M.W. & C.S.*, ¶ 46; *In re F.M.*, 2002 MT 180, ¶ 29, 311 Mont. 35, 53 P.3d 368 ("a district court cannot obtain jurisdictional authority to award the Department permanent legal custody absent [a YINC] adjudication"); *In re J.C.*, ¶ 39 ("we have repeatedly referred to the YINC adjudication as a jurisdictional prerequisite, or a threshold requirement, to the termination of parental rights") (internal quotation omitted).

¶28    Our cases since have clarified the distinction between statutory thresholds and jurisdiction.  In *In re B.W.S.*, a mother challenged the district court's assertion of subject matter jurisdiction where the district court violated statutory deadlines described in Title 41, Chapter 3, MCA.  2014 MT 198, ¶¶ 11-14, 376 Mont. 43, 330 P.3d 467.  There, we stated that a court's constitutional grant of subject matter jurisdiction is unaffected by a "failure to follow statutorily prescribed procedural deadlines." *In re B.W.S.*, ¶ 13.  We have made similar clarifications outside the context of Title 41 proceedings.  *See Miller v. Eighteenth Judicial Dist. Ct.*, 2007 MT 149, ¶¶ 42-46, 337 Mont. 488, 162 P.3d 121 (rejecting Petitioner's argument that the State's failure to provide timely notice of its intent to seek the death penalty, as required by Standard I.1.a of this Court's Standards for Competency of Counsel for Indigent Persons in Death Penalty Cases, created a jurisdictional defect); *State v. Rich*, 2022 MT 66, ¶¶ 15-16, 408 Mont. 178, 507 P.3d 176 (clarifying that the procedural deadlines of § 46-14-221, MCA, for the review of a criminal defendant's fitness to proceed do not create any jurisdictional limitations on the district

courts); *BNSF Ry. Co. v. Cringle,* 2010 MT 290, ¶¶ 13-18, 359 Mont. 20, 247 P.3d 706 (explaining that procedural time bars "scattered throughout the Montana Code Annotated and [] too numerous to mention" are distinguishable from jurisdictional provisions that "delineate the classes of cases [] . . . falling within a court's adjudicatory authority" (internal citations omitted; internal quotations omitted)). Regrettably, this Court has at times ventured into the "morass" of "loose talk about jurisdiction." *Lorang*, ¶ 60 (quoting *Yonkers v. United States*, 320 U.S. 685, 695, 64 S. Ct. 327, 333 (1944) (Frankfurter, J., dissenting)). Our recent jurisprudence, however, has clarified and emphasized the difference between legislative requirements and jurisdictional limits. *Cringle*, ¶ 13. A district court's failure to comply with statutory requirements for adjudication as youth in need of care has no effect on the court's jurisdiction to hear and determine a petition for termination of parental rights. To the extent our past cases have held otherwise, those cases are overruled.

¶29 As a statutory requirement, the procedures for adjudication may be waived. When a parent who is represented by counsel fails to object to a YINC adjudication and repeatedly acquiesces or stipulates to TLC petitions, the parent cannot raise that issue for the first time on appeal. *In re T.C.*, 2008 MT 335, ¶ 20, 346 Mont. 200, 194 P.3d 653.

¶30 During the January 29, 2019 hearing, Mother's counsel stipulated to the adjudication of Z.N.-M. as a youth in need of care. Despite her claim on appeal that she did not make any informed consent to such a stipulation, the record clearly indicates that Mother had ample opportunity to object or otherwise raise this issue with the District Court

and failed to do so. Following the January 29, 2019 hearing, Mother stipulated to continuation of the Department's custody of Z.N.-M. at least four times. The District Court made clear to Mother that she had a right to contest the Department's custody and demand a hearing on the issue. At no time during any of the subsequent proceedings did Mother object to Z.N.-M.'s adjudication as a YINC, a threshold requirement for the Department to request TLC. Section 41-3-442, MCA. Mother's numerous opportunities and repeated failures to raise this issue while represented by counsel preclude her from raising this issue now. *In re T.C.*, ¶ 20. Because the District Court relied on Mother's initial stipulation and repeated acquiescence to the adjudication of Z.N.-M. as a YINC, the District Court did not commit legal error by proceeding on the termination petition.

¶31 *Issue 3: Whether the termination of Mother's parental rights must be reversed because she received ineffective assistance of counsel.*

¶32 Mother next argues that the termination of her parental rights must be unwound because she received ineffective assistance of counsel. As Mother points out, she was represented by six different attorneys during the long course of the District Court proceedings. In briefing, Mother does not state which of the six attorneys provided ineffective assistance. We take Mother's claims, however, to argue that Erickson was ineffective by failing to raise Z.N.-M.'s status as an Indian child prior to the January 10, 2022 hearing, and that Bell was ineffective by failing to object to Z.N.-M.'s adjudication as a YINC at the January 29, 2019 hearing.

¶33 The Department responds that neither Erickson nor Bell was ineffective and that Mother cannot show she was prejudiced by any potential ineffectiveness of counsel. The

18

Department directs the Court's attention to more than a dozen reports of neglect, lack of supervision, drug use, and physical and psychological abuse of Z.N.-M. in Mother's care. According to the Department, had Bell not stipulated to Z.N.-M.'s designation as a YINC, the State would have entered these reports into evidence. The reports would have shown by a preponderance of the evidence that Z.N.-M. was a YINC. *See In re K.B.*, ¶ 19.

¶34 Where the state seeks to terminate parental rights, due process and fundamental fairness require the parent receive effective assistance of counsel. *In re E.Y.R.*, 2019 MT 189, ¶ 22, 396 Mont. 515, 446 P.3d 1117. When examining an ineffectiveness claim in termination proceedings, this Court analyzes two nonexclusive factors: (1) counsel's training and experience, and (2) the quality of counsel's advocacy provided during the proceedings. *In re B.J.J.*, 2019 MT 129, ¶ 15, 396 Mont. 108, 443 P.3d 488. If a parent shows that counsel provided ineffective assistance under the two factors listed above, relief may be granted only if the parent further demonstrates that counsel's ineffectiveness caused them prejudice. *In re C.M.C.*, 2009 MT 153, ¶ 30, 350 Mont. 391, 208 P.3d 809.

¶35 Here, Mother makes no claims regarding the training and experience of any of her attorneys. Instead, Mother asserts, the quality of advocacy was infirm because counsel failed to call witnesses, failed to contest the designation of Z.N.-M. as a YINC, and failed to fully explain to Mother the implications of the YINC adjudication. When considering the adequacy of counsel's advocacy, the inquiry includes:

> whether counsel has adequately investigated the case; whether counsel has timely and sufficiently met with the parent and has researched the applicable law; whether counsel has prepared for the termination hearing by interviewing the State's witnesses and by discovering and reviewing

documentary evidence that might be introduced; and whether counsel has demonstrated that he or she possesses trial skills, including making appropriate objections, producing evidence and calling and cross-examining witnesses and experts.

*In re A.S.*, ¶ 26.

¶36 This Court's precedents demonstrate marked contrast between deficient advocacy and the performance of Mother's attorneys. For instance, in *In re E.Y.R.*, we found the termination of a father's parental rights erroneous where father's counsel failed to "assiduously advocate" on behalf of the father, "acquiesced to the representations and positions of the Department," failed to advocate that the state "take minimal preliminary steps to ascertain [f]ather's situation," and "evidenced no knowledge or understanding" of applicable laws and regulations. *In re E.Y.R.*, ¶ 36. In contrast to the attorney in *In re E.Y.R.*, the record here demonstrates that Erickson and Bell both provided competent advocacy on Mother's behalf. Erickson undertook a diligent effort to determine the Indian status of Z.N.-M. and to raise the issue in a timely fashion. Unfamiliar with the complexities of ICWA, Erickson enlisted the expertise of a colleague to assist with Mother's representation. Unlike *In re E.Y.R.*, it cannot be said that Erickson "evidenced no knowledge or understanding" or failed to "assiduously advocate" on Mother's behalf. Similarly, the record indicates that Bell was prepared and competent in his representation of Mother. The record includes numerous documented instances of neglect, abuse, and drug use by Mother while Z.N.-M. was in her care. The record thus does not indicate that Mother had a substantial basis on which to contest adjudication.

20

¶37 Finally, Mother does not contest the record supporting the District Court's findings following the termination hearing. Mother, despite her concerted and commendable effort, failed to comply with the treatment plan. Mother's inability to secure stable housing, to provide Z.N.-M. with a stable home environment, to regularly take and pass urinalysis tests, and to ensure Z.N.-M.'s regular attendance at school led the District Court to determine that Mother had not fully complied with the treatment plan. The District Court further found that none of the above-listed failures were likely to change within a reasonable time. The District Court made a point to recognize the work and progress made by Mother. Mother's efforts notwithstanding, a decision to terminate parental rights hinges primarily on the best interest of the child. *In re A.M.G.*, 2022 MT 175, ¶ 21, 410 Mont. 25, 517 P.3d 149. The evidence here supports the District Court's findings that the statutory requirements for termination under § 41-3-609(1)(f), MCA, were met. Mother cannot show that she was prejudiced by the performance of her attorneys. *See In re C.W.E.*, 2016 MT 2, ¶¶ 16-19, 382 Mont. 65, 364 P.3d 1238; *In re K.B.*, ¶ 19. Her claims for ineffective assistance of counsel must therefore fail.

¶38 *Issue 4: Whether the District Court abused its discretion by ordering the termination of parental rights instead of a guardianship.*

¶39 It is the policy of the State of Montana to protect and preserve the unity and welfare of a family wherever possible. Section 41-3-101(1)(b), MCA. That purpose is subordinate, however, to the primary purpose of dependent-neglect proceedings: to determine what is in the best interest of the child. *In re M.R.L.*, 186 Mont. 468, 472, 608 P.2d 134, 137 (1980); *see also* § 41-3-101(1)(a), MCA. Where a district court finds that the statutory

requirements for termination are met, "no limitation requires the district court to consider other options prior to terminating parental rights." *In re T.S.*, 2013 MT 274, ¶ 30, 372 Mont. 79, 310 P.3d 538.

¶40 Here, the District Court fully considered all available options for Z.N.-M.'s placement. In its order, the District Court highlighted the hard work that Mother undertook to comply with her treatment plan. Perhaps because of Mother's laudable efforts, the District Court, over the five-year span of the proceedings below, attempted to return Z.N.-M. to the care of her mother. Ultimately, however, the court determined that Z.N.-M.'s best interest and best chance of success depended on the stability and structure of a permanent placement outside of Mother's care. Over its long interaction with the family, the District Court was in the best position to evaluate the best interest of the child. The District Court did not abuse its discretion when it determined that termination, as opposed to guardianship, was appropriate.

## CONCLUSION

¶41 Despite its acknowledgment of Mother's sincere effort and strong connection with her child, the District Court carefully considered the extensive record and determined that Mother's own continuing struggles prevent her from providing the level of care Z.N.-M. requires in the reasonable future. Finding no mistake of law, no clear error, and no abuse of discretion, we will not second-guess the District Court's determinations. For the above-stated reasons, the District Court's judgment is affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ JIM RICE