FILED

08/05/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0516

DA 24-0516

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 170

IN THE MATTER OF:

J.B.,

A Youth in Need of Care.

APPEAL FROM:  District Court of the Seventeenth Judicial District,
In and For the County of Blaine, Cause No. DN-2015-04
Honorable Yvonne Laird, Presiding Judge

COUNSEL OF RECORD:

For Appellant Mother:

Robin A. Meguire, meguirelaw.com, Great Falls, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Selene Koepke,
Assistant Attorney General, Helena, Montana

Kelsie Harwood, Blaine County Attorney, Chinook, Montana

Submitted on Briefs:  July 9, 2025

Decided:  August 5, 2025

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Mother N.B. challenges the Seventeenth Judicial District Court's order terminating her parental rights to her now ten-year-old daughter J.B. and its refusal to transfer the proceedings to tribal court. Mother argues that her appointed counsel provided ineffective assistance and that the State did not meet the standards required for termination under the Indian Child Welfare Act. We consider the following restated issues:

1. *Did the District Court err when it denied the Fort Belknap Indian Community's motion to transfer the case to tribal court based on the birth father's objection?*

2. *Did Mother receive ineffective assistance of counsel?*

3. *Did the District Court err when it terminated Mother's parental rights?*

We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2     In November 2015, the Department of Public Health and Human Services, Child and Family Services Division, removed J.B. after receiving a report that Mother was under the influence of drugs while caring for the child. In 2018, the Department moved to dismiss its petition to adjudicate J.B. as a youth in need of care because Father completed his treatment plan, maintained employment, and contributed to J.B.'s support while she was in paternal grandmother's care. The District Court granted the Department's motion and dismissed the case.

¶3     In January 2021, the Department removed J.B. from paternal grandmother's home when it received a report that J.B.'s uncle sexually abused her in the home. The Department then placed J.B. with paternal grandfather. The Department filed a petition for

2

emergency protective services, adjudication as youth in need of care, and temporary legal custody. Recognizing that it had reason to believe J.B. was an Indian child under the Indian Child Welfare Act (ICWA), the Department asserted that J.B.'s placement complied with ICWA's foster placement preferences and that it had made active efforts to return J.B. to her family and to provide remedial services and rehabilitative programs to avoid the breakup of the Indian family. The District Court appointed the Office of the State Public Defender to separately represent Mother, Father, paternal grandmother (the Indian custodian under ICWA), and J.B. The Office of the State Public Defender appointed Helge Naber to represent Mother.

¶4 In February 2021, the District Court held a show cause hearing that Mother did not attend. Naber stated that because he had no contact with Mother, he could take no position on the Department's petition for temporary legal custody. Because the Department had been unable to serve Mother, the District Court granted the Department's motion to serve her by publication. The District Court subsequently issued an order concluding that J.B. is an Indian child under ICWA; declaring that ICWA applied to the proceedings; and adjudicating J.B. as a youth in need of care.

¶5 Mother did not attend a treatment plan hearing in March 2021. Naber was present at the hearing and told the court that he had been unable to reach Mother to discuss the proposed treatment plan. Neither Mother nor Naber appeared at a second treatment plan hearing in April 2021. Counsel for the Department stated that in an e-mail exchange with Naber, he said he had been unable to reach Mother. Child Protection Specialist (CPS)

3

Brian Holt testified that he also had not heard from Mother for about a month. The District Court approved a treatment plan for Mother that required her to take parenting classes, complete chemical dependency and mental health evaluations, maintain sobriety, and stay in consistent contact with the Department, among other tasks.

¶6 In August 2021, the Department filed a petition for extension of temporary legal custody. The District Court held a hearing on the petition later that same month. Mother did not attend the hearing. Naber was present but unable to take a position on the Department's petition or to call witnesses because he had not heard from Mother. CPS Dana Kjersem testified that after speaking with Mother to arrange visitation, Mother's phone number was no longer working, and Kjersem had been unable to reach her.

¶7 In March 2022, prior to a hearing on the Department's second petition for extension of temporary custody, Naber sent the court a notice explaining that he had a scheduling conflict—a hearing before the Eighth Judicial District Court at the same time. The notice also provided that Naber discussed the extension with Mother and she did not object; that there were other kinship placements and individuals willing to supervise visits closer to Mother's location, including maternal grandmother; and that changes with the provider facility had impeded Mother's visitation. Naber indicated that he was collaborating with the CPS to resolve these issues. Although Mother did not attend the March 2022 hearing, CPS Melody Wilkes testified that the Department was helping her with the logistics of transportation to visits with J.B.

4

¶8 Later that month, the Department removed J.B. from paternal grandfather's care after discovering that other children previously alleged he sexually abused them. Mother was absent at the related April 2022 placement hearing. Naber attended the hearing and told the court that he had not heard from Mother for several weeks. The District Court approved J.B.'s placement with her maternal grandmother.

¶9 Court Appointed Special Advocate (CASA) Danette Love filed a report on J.B.'s progress. CASA Love reported that in June 2022 J.B.'s sexual behavior towards other children in her maternal grandmother's home was causing problems and that J.B. needed a program specializing in sexual behaviors. The Department decided to place J.B. in a therapeutic foster home in Great Falls. In July 2022, CPS Wilkes visited J.B. in maternal grandmother's home the day of J.B.'s move to Great Falls. Mother arrived, appeared to be under the influence of drugs and alcohol, and made statements that upset J.B. CPS Wilkes later testified that Mother behaved aggressively and told Wilkes she had used "dope" five minutes before seeing J.B. CPS Wilkes suggested to Mother that she could go to treatment in Great Falls, but Mother was not interested in help at that point. In September 2022, CPS Wilkes told CASA Love that Mother was not engaged with the Department and that she had not heard from Mother since July 2022. That same month, neither Mother nor Naber appeared at the court's third hearing to extend temporary legal custody.

¶10 In October 2022, the court held a placement hearing and heard testimony from ICWA qualified expert witness Edie Adams. Naber appeared at the hearing, but Mother did not. The court found good cause to deviate from ICWA's placement preferences in

approving J.B.'s placement in Great Falls due to J.B's "extraordinary physical, mental, or emotional needs that are not able to be met in the community where the compliant placement preference is located." The court also noted that maternal grandmother requested a placement for J.B. that could address her mental and emotional needs.

¶11 Naber appeared for a February 2023 placement hearing, and Mother was absent. CPS Crystal Whitmore testified that Mother did not have a stable residence; once she had a permanent place to live the Department would start with visitation again. Naber told the court that he had no contact with Mother, and he could take no position on J.B.'s placement.

¶12 In April 2023, the court held the fourth hearing on an extension of temporary legal custody. Mother and Naber both appeared at this hearing. Naber told the court that Mother had completed an updated chemical dependency evaluation, had been attending virtual visitation with J.B., and had secured housing in Harlem. Mother did not object to an extension of temporary legal custody. CPS Cyndi Baillargeon testified that J.B.'s sexual behaviors were worsening at school and that she could not access sufficient mental health care in Big Sandy. The Department was facilitating video visitation for Mother to gradually rebuild a connection to J.B. After these video calls, CPS Baillargeon stated, J.B. had behavioral issues.

¶13 In May 2023, the Department moved J.B. to Coastal Harbor Health System in Savannah, Georgia, due to increasing behavioral issues at school and at her placement in Big Sandy. In an affidavit attached to the Department's request for a placement hearing, CPS Baillargeon documented Mother's virtual visitations with J.B. from March to May

6

2023. In the nine scheduled visitations during this timeframe, Mother was unreachable or unintelligible due to poor service six times. Both Mother and Naber attended the placement hearing in June 2023. CPS Baillargeon testified that Mother's inconsistent appearance at scheduled visitations had impacted J.B. Naber cross-examined CPS Baillargeon, establishing that J.B. underwent at least six or seven placement changes in the previous two years. Naber did not object to J.B.'s placement in Georgia but, given the frequency of her placement changes, asked the Department to work towards a permanent placement. The District Court temporarily approved J.B.'s Georgia placement pending testimony from an ICWA qualified expert witness. Despite Mother's absence, Naber appeared for the subsequent ICWA placement hearing in July 2023.

¶14 The Department filed its fifth petition for extension of temporary legal custody in September 2023. In an attached affidavit, CPS Baillargeon attested that she received an e-mail from a counselor at Coastal Harbor expressing that J.B. did not want to talk to Mother during virtual visitations—Mother felt like a "stranger" to her. CASA Love reported that during a recent visit to maternal grandmother's house, grandmother told Love that Mother had "fallen off the wagon again, had slashed her boyfriend's tires and was back in a relationship with an old boyfriend who was 'not good for her.'" CASA Love also noted her concern that Mother inconsistently engaged in visitation and lacked an understanding of J.B.'s involved needs.

¶15 In October 2023, the Fort Belknap Indian Community ("the Tribes") filed a notice of intervention and moved to transfer the proceedings to Fort Belknap Tribal Court. The

Tribes intervened on the basis that J.B. is an enrolled tribal member of the Fort Belknap Indian Community. Both Mother and Naber appeared at the October 2023 hearing on the motion to extend temporary legal custody, where Naber represented that Mother supported the transfer to tribal court and did not object to extending temporary legal custody. At the District Court's request, Mother filed her written consent to transfer of the proceedings to Fort Belknap Tribal Court. Mother did not appear for any subsequent hearings.

¶16 Father filed an objection to the motion to transfer, asserting that transfer was not in J.B.'s best interests. Father did not appear at the transfer hearing in November 2023. Counsel for the Tribes stated that "an objection from the parent sort of kills our motion." Although Naber admitted he could not point to precedent supporting transfer despite one parent's objection, he highlighted J.B.'s numerous placements since the State assumed custody and noted that "the state might be running out of ideas and we have to keep the best interest of the child in mind." After considering the applicable federal regulation, the court denied the motion to transfer due to Father's objection.

¶17 The District Court held a status hearing in January 2024. CPS Baillargeon testified that the Department's contact with Mother had been sporadic and that Mother recently had been arrested. Mother was "highly intoxicated" and tested positive for methamphetamines when CPS Baillargeon visited her in the Valley County jail. Mother's minimal engagement with the Department, her mental health, substance use, and domestic violence in the home, CPS Baillargeon testified, informed the Department's intent to petition for termination of

8

Mother's parental rights. At the end of the hearing, Naber asked the Department to send him any updated contact information for Mother.

¶18 J.B. had been in the Department's care for more than three years when it filed a petition to terminate Mother and Father's parental rights in April 2024. In an attached affidavit, CPS Baillargeon detailed Mother's noncompliance with the treatment plan. CPS Baillargeon attested, among other tasks, that Mother had failed to regularly attend scheduled in-person, virtual, and phone visitation; that Mother had failed to complete in-patient treatment or to follow through with the recommendations of several chemical dependency assessments; and that Mother had not stayed in consistent contact with the Department.

¶19 At the initial termination hearing in June 2024, Naber could not take a position on termination due to Mother's absence. Naber told the court that Mother was "said to have done some components of the Treatment Plan," but that he "really ha[d] no information one way or the other." After paternal grandmother's attorney raised concerns with proper notice under ICWA, the court rescheduled the termination hearing for the following month. Naber again could not take a position on termination at the second termination hearing because he had not heard from Mother "in a rather long time." After hearing testimony from a qualified expert witness and CPS Baillargeon, the District Court terminated Mother and Father's parental rights.[1]

---

[1] Father did not appeal.

**STANDARDS OF REVIEW**

¶20 "We review a district court decision to terminate parental rights for an abuse of discretion under the applicable standards of Title 41, chapter 3, MCA, and the federal Indian Child Welfare Act (ICWA), Title 25, chapter 21, U.S.C." *In re D.L.L.*, 2025 MT 98, ¶ 6, 421 Mont. 522, 568 P.3d 552 (citation omitted). "In this context, a court errs and abuses its discretion if it terminates parental rights based on clearly erroneous findings of fact, erroneous conclusions of law, or otherwise acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re D.L.L.*, ¶ 6 (quoting *In re L.D.*, 2018 MT 60, ¶ 10, 391 Mont. 33, 414 P.3d 768). "Findings of fact are clearly erroneous if not supported by substantial evidence, the court misapprehended the effect of the evidence, or we are firmly convinced a mistake was made." *In re D.L.L.*, ¶ 6 (citation omitted). We review a trial court's conclusions of law for correctness. *In re D.L.L.*, ¶ 6 (citation omitted). Ineffective assistance of counsel claims we review de novo. *In re Z.N.-M.*, 2023 MT 202, ¶ 10, 413 Mont. 502, 538 P.3d 21 (citation omitted).

**DISCUSSION**

¶21 *1. Did the District Court err when it denied the Fort Belknap Indian Community's motion to transfer the case to tribal court based on the birth father's objection?*

¶22 "In 1978, Congress enacted [ICWA] out of concern that 'an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'" *Haaland v. Brackeen*, 599 U.S. 255, 265, 143 S. Ct. 1609, 1623 (2023) (quoting 92 Stat. 3069, 25 U.S.C.

10

§ 1901(4)). "ICWA imposes heightened federal standards for the removal of Indian children from Indian families." *In re D.L.L.*, ¶ 8 (quoting *In re L.H.*, 2021 MT 199, ¶ 11, 405 Mont. 173, 492 P.3d 1218). "At the core of ICWA is the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected." *In re D.L.L.*, ¶ 8 (quoting *In re L.D.*, ¶ 12). The parties do not dispute that J.B. is an "Indian child" under ICWA or that ICWA applies to this case. *See* 25 U.S.C. § 1903(1), (4).

¶23 Indian tribes generally have exclusive jurisdiction over child custody proceedings involving an Indian child who lives on a reservation. 25 U.S.C. § 1911(a). When, as here, an Indian child does not live on a reservation, state and tribal courts exercise concurrent jurisdiction. 25 U.S.C. § 1911(b); *Brackeen*, 599 U.S. at 265-66, 143 S. Ct. at 1623. A state court must transfer jurisdiction to the tribe "*absent objection by either parent*, upon the petition of either parent . . . or the Indian child's tribe." 25 U.S.C. § 1911(b) (emphasis added). Federal regulations similarly provide that a state court must transfer the proceedings to tribal court unless either parent objects. 25 C.F.R. § 23.117; *accord* § 41-3-1310(5), MCA ("If either of the Indian child's parents objects to transfer of the proceeding to the Indian child's tribe, the court may not transfer the proceeding.").

¶24 Mother argues that Father waived or withdrew his objection to transfer when he did not attend the hearing, did not discuss his objection with counsel, and essentially failed to support his position. She cites decisions of this Court in other contexts where we recognized that a party may waive its rights through a course of conduct that "manifests

11

the intention to forgo the benefit." *Collection Bureau Servs., Inc. v. Morrow*, 2004 MT 84, ¶ 11, 320 Mont. 478, 87 P.3d 1024.

¶25     This Court, however, must follow ICWA's provisions as a matter of law. *In re M.S.*, 2014 MT 265, ¶ 14, 376 Mont. 394, 336 P.3d 930 (quoting 25 U.S.C. § 1902). Both 25 U.S.C. § 1911(b) and its accompanying federal regulation provide that a parent's objection prevents the transfer to tribal court. 25 C.F.R. § 23.117. Neither allows that a parent's absence from a transfer hearing waives the parent's written objection to transfer. 25 U.S.C. § 1911(b); 25 C.F.R. § 23.117. Montana's parallel statute contains equally absolute language: a court "may not transfer" the case if a parent objects. Section 41-3-1310(5), MCA. Federal and state authorities are consistent in their interpretation of ICWA's transfer provision that either parent's objection functions as a veto over transfer. *See, e.g.* Comm. on Interior & Insular Affairs, *Establishing Standards for the Placement of Indian Children in Foster or Adoptive Homes, to Prevent the Breakup of Indian Families, and for Other Purposes*, H.R. Rep. No. 95-1386, at 21 (1978) (noting that 25 U.S.C. § 1911(b) gives either parent the right to "veto such transfer"); *In re Larissa G.*, 51 Cal. Rptr. 2d 16, 22 (Cal. App. 4th Dist. 1996) (parent has "veto power over any decision to transfer to the tribe's jurisdiction a proceeding for foster care placement or termination of parental rights"); *In re S.F.*, 2010 OK CIV APP 5, ¶ 9, 230 P.3d 911 ("The right of either parent to object is absolute and such objection serves as a veto over transfer of the case to tribal court."); *In re D.A.C.*, 933 P.2d 993, 997 (Utah Ct. App. 1997) ("adopt[ing] the majority view that the plain language of section 1911(b) allows parents of

12

Indian children domiciled off a reservation an absolute veto over transfer of jurisdiction to tribal courts"); *In re S.Z.*, 325 N.W.2d 53, 56 (S.D. 1982) (trial court erred when it transferred jurisdiction despite parent's knowing and voluntary veto).

¶26　ICWA's plain language and the overwhelming interpretation of 25 U.S.C. § 1911(b) render Mother's argument—that Father's absence from the hearing waived his objection— unavailing. Nothing in the statute required Father to appear in court and explain his position. Mother cites *In re Cal. E.*, 235 N.E.3d 700 (Ill. App. Ct. 4th Dist. 2023), for her argument that Father waived or withdrew his objection. That case, however, reaffirms that a parent's objection vetoes transfer to tribal court. *In re Cal. E.*, ¶¶ 143-44 (stating that "[t]he statute, regulation, and guidelines make eminently clear that a trial court must deny transfer if either parent has objected to the transfer" and concluding that a parent's death did not render his objection a "nullity"). Under 25 U.S.C. § 1911(b), a parent's objection to transfer of an applicable proceeding to tribal court operates as an absolute veto. The District Court did not err when it denied the Tribes' motion to transfer after Father objected.

¶27　*2. Did Mother receive ineffective assistance of counsel?*

¶28　Due process and fundamental fairness require that parents receive effective assistance of counsel in termination proceedings. *In re Z.N.-M*, ¶ 34 (citation omitted). "When examining an ineffectiveness claim in termination proceedings, this Court analyzes two nonexclusive factors: (1) counsel's training and experience, and (2) the quality of counsel's advocacy provided during the proceedings." *In re Z.N.-M*, ¶ 34 (citation

omitted). To obtain relief a parent also must demonstrate that counsel's ineffectiveness caused them prejudice. *In re Z.N.-M*, ¶ 34 (citation omitted).

¶29 Mother does not take issue with Naber's training and experience, instead contending that his advocacy was ineffective. Mother points to Naber's absence from three hearings—the treatment plan hearing in April 2021, the temporary custody extension hearing in March 2022, and the temporary custody extension hearing in September 2022—to support her claim. Mother asserts that Naber was unreachable by phone; that Naber failed to argue Father's absence from the ICWA transfer hearing "amounted to [Father's] withdrawal o[r] waiver of his objection"; and that Naber did not object to the State's insufficient evidence during the termination hearing.

¶30 Of the three hearings Naber missed, the Department contends that two absences were for legitimate reasons. At the April 2021 hearing on Mother's treatment plan, the Department's attorney told the court that Naber had not heard from Mother. Before the March 2022 hearing, Naber notified the court that he had a scheduling conflict and that Mother did not object to the Department's extension of legal custody. He also recommended that the Department find a placement for J.B. closer to Mother's location.

¶31 "It is not realistic to expect counsel to make objections or particularly advocate for a client when counsel is unable to locate or contact the client and the client fails to contact the attorney." *In re B.J.J.*, 2019 MT 129, ¶ 18, 396 Mont. 108, 443 P.3d 488. Consequently, "[a] parent cannot establish IAC through his own failure to contact and engage with counsel." *In re B.J.J.*, ¶ 18. On several occasions during these proceedings,

14

Naber told the court that he could not represent Mother's position because he had no contact with her.[2] When Mother did attend hearings in June and October 2023, Naber understood her position and advocated on her behalf. At the June 2023 hearing, Naber questioned CPS Baillargeon about J.B.'s numerous placements. At the October 2023 hearing, he told the court that Mother supported the transfer to tribal court and that she did not object to the extension of temporary custody. Although Naber had not heard from Mother "in a rather long time" at the termination hearing, he examined CPS Baillargeon and argued that the petition for termination was premature without a permanent placement arranged for J.B.

¶32 In sum, the record shows that Mother failed to maintain contact with the Department or Naber throughout the three-and-a-half years of proceedings. Mother's argument that it was Naber who failed to maintain contact is not supported in the record. We cannot expect Naber to make objections or effectively advocate for Mother when she was unreachable. *See In re B.J.J.*, ¶ 18. She cannot sustain an ineffective assistance of counsel claim when the record shows her own lack of engagement in the case or contact with Naber. *See In re B.J.J.*, ¶ 18.

¶33 *3. Did the District Court err when it terminated Mother's parental rights?*

¶34 Section 41-3-609(1)(f), MCA, allows a court to terminate parental rights if it finds that the child is an adjudicated youth in need of care, the parent has not complied with a treatment plan approved by the court, and the parent's unfitness is unlikely to change within

---

[2] Counsel for Father and counsel for the Indian Custodian often made the same representations.

a reasonable time. In cases involving an Indian child, the court may not terminate parental rights unless

> evidence beyond a reasonable doubt is presented that:
>
> (a) active efforts were made to prevent the breakup of the Indian family and the efforts were unsuccessful; and
> (b) continued custody by the child's parent or Indian custodian is likely to result in serious emotional or physical damage to the child. The evidence must include testimony of one or more qualified expert witnesses.

Section 41-3-1320(2), MCA; *accord* 25 U.S.C. § 1912(d)-(f). Unlike the requirement for reasonable efforts in cases involving non-Indian children under state law, "ICWA requires the district court to make a specific finding [based on evidence beyond a reasonable doubt] 'that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.'" *In re K.L.N.*, 2021 MT 56, ¶ 19, 403 Mont. 342, 482 P.3d 650 (quoting 25 U.S.C. § 1912(d)). Active efforts are

> affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. . . . To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case.

*In re D.L.L.*, ¶ 10 (quoting *In re B.Y.*, 2018 MT 309, ¶ 9, 393 Mont. 530, 432 P.3d 129).

The Department must make active efforts at reunification, but "a parent also has 'an obligation to avail herself of services arranged or referred by the Department and engage

16

with the Department to successfully complete her treatment plan.'" *In re D.L.L.*, ¶ 11 (quoting *In re R.J.F.*, 2019 MT 113, ¶ 38, 395 Mont. 454, 443 P.3d 387) (citation omitted).

¶35    Mother argues that the State failed to meet its burden of demonstrating the statutory criteria for termination beyond a reasonable doubt.  The court, Mother asserts, failed to make specific findings that the statutory criteria were met and instead relied on general testimony from CPS Baillargeon and the qualified expert witness to terminate Mother's parental rights.

¶36    Qualified expert witness Anna Marie White testified that the Department's attempts to place J.B. with relatives and to engage the parents at family meetings, its contact with the Tribes, and J.B.'s placement in a residential therapeutic facility constituted active efforts to reunify J.B. with her parents or extended family.  The age of the case reflected the Department's attempt to do "anything and everything" before pursuing termination. The Tribes, White also testified, supported termination of Mother's parental rights.  Last, White told the court that the parents' continued custody of J.B. would place her in imminent harm.

¶37    CPS Baillargeon testified that since the Department filed the petition for termination, she had called Mother a couple times and was unable to contact her.  When CPS Baillargeon successfully reached Mother the morning of the June termination hearing, Mother declined a ride to the hearing.  Mother, CPS Baillargeon indicated, had not completed the assigned tasks in her treatment plan.  At the time of the hearing, CPS

Baillargeon told the court that J.B. had been in the Department's care for a total of forty-one or forty-two months.

¶38 During the hearing, the court found that the Department made active efforts to reunify J.B. with her parents and that the parents' engagement with the Department had been "sporadic at best." The court also found that neither parent had completed their treatment plan or stayed in contact with the Department or with their counsel. The court reasoned that it was "not in [J.B.'s] best interest to continue to allow her parents to sporadically interact with her and then pull out while she remains in limbo regarding placement and permanency" and that "it is unlikely that either of the parents will, in a reasonable amount of time, get themselves to a position . . . where they would be able to care for the child." The court urged the Department to find J.B. a placement in Montana because, as an Indian child, "[h]er ties with her community are strong and removing her from the State of Montana would effectively cut her off from her culture and her traditions and her family . . . and to cut her off from that would not be in her best interests."

¶39 In its final order, the court found that J.B. previously was adjudicated as a youth in need of care and that, under § 41-3-604(1), MCA, her best interests were presumptively served by termination because she had been in foster care for over fifteen of the past twenty-two months. The court detailed the Department's efforts to find a family placement for J.B. These efforts included asking Mother and Father for other family interested in serving as a placement, talking to individuals who Mother and Father identified,

conducting a Seneca search,[3] checking social media to find other family members, and approaching maternal grandmother, who was willing to be a placement after J.B. had received care for her emotional and behavioral needs. The District Court noted that the Department repeatedly referred Mother to chemical dependency assessments and in-patient treatment. The Department also provided gas vouchers for Mother to attend visitation and appointments and offered Mother rides to hearings before the District Court.

¶40 Mother's continued, excessive use of methamphetamine and alcohol and her inability to stay out of volatile and dangerous situations, the court reasoned, contributed to her unfitness to parent J.B. This behavior continued for years. The court considered that Mother had not made substantial efforts to build skills in caregiving or to maintain contact and build a relationship with J.B. Mother had not followed her providers' recommendations or "demonstrated the ability to provide a stable and safe environment that would support [J.B.'s] needs." The court found that Mother's conduct was unlikely to change within a reasonable time, concluding that termination of Mother's parental rights "would eliminate the possibility that [J.B.] be exposed to [an] unsafe and hazardous living environment that would cause her great detriment." As called for in 25 U.S.C. § 1912(f) and § 41-3-1320(2)(b), MCA, the court concluded that the qualified expert witness's testimony and the record as a whole provided evidence beyond a reasonable doubt that Mother's continued custody was likely to result in serious emotional or physical damage

---

[3] A Seneca search examines Internet databases for potential relatives who could serve as a placement. *C.A.M. v. Mobile Cnty. Dep't of Human Res.*, No. CL-2024-0384, 2025 WL 880122 at *3 (Ala. Civ. App. Mar. 21, 2025).

to J.B. The court further concluded that evidence beyond a reasonable doubt established J.B.'s best interests would be served by termination of Mother's parental rights.

¶41 After the court recognized that J.B. had been adjudicated as a youth in need of care, it relied on sufficient evidence to rule that Mother had not complied with her treatment plan and was unlikely to change within a reasonable time. *See* § 41-3-609(1)(f), MCA; *In re K.L.N.*, ¶ 19 (citations omitted). The record plainly demonstrates that, in the three years after J.B. was removed from Father's care in 2021, Mother did not progress on her treatment plan. This extended period with no progress established that Mother was unlikely to change within a reasonable time. Because of the trauma she has experienced, J.B. has serious emotional and behavioral needs, as evidenced by her extended placement at an inpatient facility in Georgia and by maternal grandmother's request that J.B. receive behavioral and emotional treatment before placement again in grandmother's care. "When considering any of the relevant factors in determining the likelihood of [a parent's] change [in conduct], the court must give primary consideration to the physical, mental, and emotional conditions and needs of the child." *In re D.L.L.*, ¶ 9 (quoting *In re A.B.*, 2020 MT 64, ¶ 24, 399 Mont. 219, 460 P.3d 405). The District Court properly gave primary consideration to J.B.'s best interests in finding that Mother's sporadic contact and inability to provide a safe and stable environment for J.B. would not meet the child's heightened needs.

¶42 Relying on the qualified expert witness's testimony, Mother's excessive drug use, and her repeated presence in dangerous situations, lack of a relationship with J.B., and

inability to provide safety and stability, the court found evidence beyond a reasonable doubt that Mother's continued custody would result in serious emotional or physical damage to J.B. *See* 25 U.S.C. § 1912(f). Last, the court pointed to substantial record evidence that the Department made active efforts to provide rehabilitative programs and remedial services to Mother aimed at reunification with the Indian family. Mother, however, failed to avail herself of these services or to stay in contact with the Department. *See In re D.L.L.*, ¶ 11 (citations omitted).

¶43 The court did not, as Mother argues, merely recite the statutory criteria for termination absent specific factual findings. Instead, the court examined each statutory inquiry and found that evidence beyond a reasonable doubt supported termination of Mother's parental rights. The court did not rely on clearly erroneous findings of fact or erroneous conclusions of law, nor did it act arbitrarily, without conscientious judgment, or exceed the bounds of reason resulting in a substantial injustice. *See In re D.L.L.*, ¶ 6 (citation omitted). The District Court did not abuse its discretion in terminating Mother's parental rights.

## CONCLUSION

¶44 We conclude that, under the plain language of 25 U.S.C. § 1911(b) and the clear weight of authority interpreting this statute, Father did not waive his objection to transferring the case to tribal court through his absence from the hearing. Mother has not met her burden on appeal to show ineffective assistance of counsel, particularly in light of her own lack of engagement. The District Court did not abuse its discretion when it relied

21

on evidence beyond a reasonable doubt to terminate Mother's parental rights. The District Court's order is affirmed.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M BIDEGARAY
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON